## LOVEMAN, JOSEPH & LOEB v. NATIONAL LABOR RELATIONS BOARD.

### No. 11043.

Circuit Court of Appeals, Fifth Circuit.

Jan. 18, 1945.

Rehearing Denied Feb. 26, 1945.

770

Kenneth Perrine and Benj. Leader, both of Birmingham, Ala., for petitioner.

Alvin J. Rockwell, General Counsel, National Labor Relations Board, Malcolm F. Halliday, Associate General Counsel, National Labor Relations Board, and Dominick L. Manoli, Senior Attorney, National Labor Relations Board, all of Washington, D. C., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

Petitioner, the operator of a department store in Birmingham, Alabama, which normally employs around 800 people, petitions the Court to review and set aside an order of the National Labor Relations Board which directed the petitioner to cease and desist from unfair labor practices and to offer back pay and reinstatement to three employees against whom the Board found there had been unfair discrimination due to the adherence to the union by these three employees. The Board has requested that the order be enforced.

The grounds urged by the petitioner may be reduced to two: (1) that the National Labor Relations Act is not applicable to petitioner; (2) that the findings of fact of the Board are not supported by the evidence. In the consideration of the second defense the facts will have to be considered separately in relation to: (1) the alleged unfair labor practices of the petitioner; (2) the facts in regard to the employee, Mrs. Mae Burkett; (3) the facts in relation to the employee, Mrs. Virginia Williams; and (4) the facts in relation to the employee, Mrs. Martha Stewart.

During the year 1943 the purchases by petitioner were approximately $4,000,000 and its sales were approximately $6,000,000, of which some $250,000 were mail order sales, two per cent of which, or $5,000, were to parties outside the State of Alabama. Fifty per cent of the purchases by the petitioner were from points outside the State of Alabama, necessitating the shipment of goods across state lines into the State of Alabama.

It will be kept in mind that under the National Labor Relations Act neither the employer nor the employee need be engaged in interstate commerce as that term was formerly understood and currently defined, but jurisdiction follows if the acts questioned, or practices involved, might adversely affect interstate commerce. More specifically, the test of the coverage of the Act has been stated to be whether or not a shut-down of the operation of the business in question by industrial strife would, or might, have immediate, direct, and paralyzing effect on commerce. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. The business of the petitioner is large and it seems to us that it cannot be gainsaid that a shut-down of the business of the petitioner would have a direct effect upon the flow of goods in interstate commerce.

We hold that the petitioner was within the coverage of the Act and that even though the business of the petitioner, in isolation, would be intrastate, nevertheless, Congress had the power, and exercised it in the passage of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., to subject to national supervision and restraint local acts which adversely affect the free flow of goods in interstate commerce. Enterprise Box Company v. Fleming, 5 Cir., 125 F.2d 897; Santa Cruz Fruit Packing Company v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954. This rule was announced as the law of the land in a decision rendered before the inception of the current judicial assaults upon state sovereignty. See United Mine Workers v. Coronado Coal Company, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762.

A careful study of the evidence reveals that there was substantial evidence to support the finding of the Board that the petitioner was guilty of interfering with, restraining, and coercing its employees in the exercise of their rights under Sec. 7, 29 U.S.C.A. § 157, to form and join a union, and a repetition of the facts in evidence would serve no useful purpose to the bench and bar.

But the findings of the Board that the employee, Mrs. Burkett, was dismissed in furtherance of coercive tactics of the petitioner to deter employees from joining the union, and that the refusal to re-employ Mrs. Martha Stewart and Mrs. Virginia Williams was because of their union adherences, are not supported by substantial evidence.

The situation in reference to Mrs. Williams is somewhat distinctive. In the first place, she knew when she was employed that she was merely taking the place of another employee, Miss Scairo, and this is definitely substantiated and demonstrated by the fact that Miss Scairo came back to work on the 2d day of August and on that day Mrs. Williams was released. The testimony on the part of the employer was to the effect that Mrs. Williams was inaccurate in her work as a cashier. Mrs. Williams was suffering from a fatal malady, from which she later died. The date of the inception of this disease is not shown, but the frequent changes in position by Mrs. Williams after her release because the work was too hard for her, together with the nature of her malady, strongly suggests that her affliction existed during her employment by the petitioner and doubtless caused her to make mistakes as cashier, which result lends credence to the testimony of the superintendent as to the inaccuracy of Mrs. Williams as a cashier. The history of her inability to hold jobs after her discharge, which she seemed to have no difficulty in obtaining, the fact that she was not discharged until the return of Miss Scairo, whose place she had taken, so conclusively support the testimony of the petitioner as to the reason she was not retained in permanent employment, that the holding of the Board that her release was due to her union affiliations appears to us to be without substantial support. Furthermore, her death has rendered the question of her reinstatement moot.

The enforcement of the order for the reinstatement of Mrs. Williams is denied.

The Board held that the discharge of Mrs. Martha Stewart for insubordination was justifiable but that the petitioner "discriminatorily refused to reinstate her". We cannot concur. If the petitioner was justified in discharging Mrs. Stewart for insubordination, it was justified in not re-employing her for the same reason, because there is no evidence whatsoever of any change of heart on the part of the employee or of any repentance for the insubordinate acts that justified her discharge in the first place, and since the employer was justified in the initial discharge it was justified in keeping her discharged.

The order directing her reinstatement for back pay will not be enforced.

The other employee ordered reinstated with back pay was Mrs. Mae Burkett, whom the Board found had been refused re-employment because of her membership and activities in the union. The petitioner contended that Mrs. Burkett had voluntarily quit her employment to take care of her son, and that at the time she quit she had no intention to return, and that when she found she could not collect unemployment compensation if the record showed that she had voluntarily ceased to work, she created such a furor that the employer, at her instance, changed her employment card to read "no work available". It is shown by Mrs. Burkett's own testimony that she did get off to nurse her son, who was ill with malaria in the State of Mississippi; that she later came back and informed floor manager Weed that she would have to be away an

additional twenty-one days in which to continue to nurse her son. Mrs. Burkett testified that at that time she told Mr. Weed: "Well, when this twenty-one days is up, if you want me back all right, and if you don't it is still all right." Mrs. Harris, the superintendent, testified that when Mrs. Burkett left she inquired: "Well, Mrs. Burkett, would you be willing to come back and help us during the busy seasons," and she said, "Yes, if I possibly can." July 16 was the date upon which Mrs. Burkett advised that her son's illness was malaria and that the treatment would require an additional twenty-one days. She did not return, nor offer to return, at the expiration of the twenty-one days, but twenty-eight days later she telephoned to ascertain whether the premiums on her hospital insurance had been paid. She was informed that the record showed that she had been dropped from the payroll. She had been out of the store then for thirty-seven days and there seems to be no reason why she should be kept on the payroll when she had not worked for so long a time. In the meantime, her place had been filled with another employee.

Mrs. Burkett admits that she went to the office seeking a separation slip, and the reason stated thereon was "Got off to nurse my sick son", but Mrs. Burkett refused to accept that slip, which, according to her own testimony, was the real reason why she had left. But knowing that she could get no unemployment compensation if she had ceased to work for such purposes, she insisted upon having the card changed to show that there was no work available. According to her own testimony, she insisted upon procuring, and did procure, and did use, and did receive the benefit of a false certificate in order that she might collect unemployment compensation insurance. She testified that there was work available but insisted upon using a card showing there was no work available. Other witnesses whose testimony is unimpeached testified that Mrs. Burkett had frequently stated that she was going to quit, that her husband did not want her to work, and furthermore that she never asked for her job back. This gives strong support to the viewpoint that she was more interested in drawing unemployment compensation than she was in being employed. She admitted that since she left the store she had not tried to get any further employment, and as an excuse for drawing unemployment compensation when she admittedly had not tried to secure employment

she stated that Mrs. Orr, of the United States Employment Service, had declined to recommend her for a job because she was in a labor dispute. Mrs. Orr, a witness who is wholly disinterested, denied positively that she made any such statement to the witness. Mrs. Burkett's own testimony is to the effect that her husband and son did not want her to work and that she had frequently talked of quitting. The fact that she intended to quit of her own volition is supported by the testimony of several other disinterested witnesses. Mrs. Burkett had had a two-weeks' vacation shortly before the 7th of July when she left to see about her son, and this gives credence to the testimony of Mrs. Armstrong, a witness for the Board, that Mrs. Burkett had made the following statement to her: "She didn't exactly talk about quitting on account of the illness of her son. She said last Christmas that after vacation was over she wasn't going to work any more during the summer, that she was going to work until she got her paid vacation and she was going to quit." Whereupon the witness criticized Mrs. Burkett for not giving the company notice. Of course, if she had given notice that she was quitting voluntarily, she could not have collected unemployment compensation insurance.

█ The finding that Mrs. Burkett was discharged for union activities is not supported by substantial evidence, and the order to reinstate her and to make her whole for any losses which she might have sustained will not be enforced.

We cannot support the Examiner and the Board in cleaving only to the testimony of a witness who was clearly shown to be collecting unemployment compensation under a false claim, and whose testimony was so definitely impeached in several particulars by a number of witnesses who clearly appear to be disinterested.

But there is substantial support in the evidence for the findings of the Board that the petitioner did engage in unfair labor practices in seeking to interfere and restrain its employees in the exercise of the rights guaranteed in Sec. 7 of the National Labor Relations Act to belong to a union, and all of its order, except paragraphs 2(a) and 2(b) will be enforced; that is to say, that sub-paragraphs (a) and (b) of paragraph 1 will be enforced, and all of sub-paragraph (c) of paragraph 2 will be enforced except that portion which relates to paragraph 2(a) and 2(b).