**NATIONAL LABOR RELATIONS BOARD v. MONTGOMERY WARD & CO., Inc.**

**No. 13332.**

Circuit Court of Appeals, Eighth Circuit.

Oct. 23, 1946.

Robert Fousek, Regional Atty., National Labor Relations Board, of Kansas City, Mo. (Gerhard P. Van Arkel, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and G. Mallet-Prevost and Robert E. Mullin, D. C. Attys., all of Washington, D.C., on the brief), for petitioner.

Stuart S. Ball, of Chicago, Ill. (John A. Barr and William L. Lamey, both of Chicago, Ill., on the brief), for respondent.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This is a petition by the National Labor Relations Board for the enforcement of an order entered by it requiring Montgomery Ward & Co., respondent, to cease and desist from certain alleged unfair labor practices, to offer reinstatement with back pay to certain discharged employees, and to post appropriate notices.

The respondent, Montgomery Ward & Co., is engaged in the sale and distribution of general merchandise throughout the United States. It operates nine retail order houses and more than 500 retail stores in various states, including a mail order house and retail store in Kansas City, Missouri.

Upon charges filed by United Mail Order, Warehouse & Retail Employees Union, Local 131, affiliated with United Retail, Wholesale and Department Store Employees of America, C. I. O., the National Labor Relations Board, on the 4th day of October, 1944, issued its complaint against respondent, alleging that respondent had engaged in and was engaging in certain unfair labor practices. Upon issue joined by answer of the respondent a hearing was held before a trial examiner who made an intermediate report sustaining the charges, and on exceptions filed by respondent the Board adopted the findings of the examiner which in effect found that respondent had violated Section 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(3), by discharging Henry Medlin, Roy Skinner and Walter Smith in June and July, 1943, and by refusing to reinstate Helen Slanko, Ramona Sullivan and Marvel Gaylord on April 24, 1944. The Board also found that respondent had violated Section 8(1) of the Act by these discharges, by a speech to employees made on January 4 and 5, 1944, by respondent's Manager of Labor Relations, and by certain remarks during a period of fifteen months made by certain minor supervisory employees. Respondent was accordingly ordered to cease and desist from discouraging membership in the union or any other labor organization by discharging or refusing to reinstate any of its employees or by discriminating in any other manner in regard to their hire or tenure of employment or any term or condition of their employment, and from in any manner interfering with, restraining or coercing its employees in the exercise of the right to self organization, to form labor organizations, to join or assist the union or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage

in concerted activities for the purpose of collective bargaining or other mutual aid and protection as guaranteed in Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. Respondent was ordered to offer to the discharged employees immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or to their rights and privileges and to make them whole for any losses of pay they had suffered by reason of the discriminatory discharges.

The C. I. O. had sought to organize respondent's Kansas City plant since 1937. In March, 1943, it began an active campaign which reached its height in June and July, 1943. As the campaign progressed the union petitioned the National Labor Relations Board to conduct an election at respondent's plant. In response to this request the Board directed that an election be held January 11, 1944. On January 4 and 5, 1944, respondent summoned its employees to leave their work in a series of small groups and assemble in the girl's recreation room to hear a speech by John A. Barr, respondent's Labor Relation Manager. Nine such meetings were held in the plant and Barr's remarks were substantially the same at each meeting. At the election the union lost in the mail order unit and won in the retail store unit. So far as appears the election has not been set aside nor the result directly challenged.

On this review respondent contends that (1) the Board's findings as to the discharges of Medlin, Skinner and Smith are not supported by substantial evidence and are based upon erroneous applications of the law; (2) the Board erred in holding that Helen Slanko, Ramona Sullivan and Marvel Gaylord could not properly be discharged for their admitted insubordination and in ordering them to be reinstated; (3) the Board, in holding that respondent violated the Act by the talk to employees made by its Labor Relation Manager, has misconstrued the applicable law and has denied respondent the right of free speech guaranteed by the First Amendment to the Constitution; (4) the Board's finding that respondent interfered with, restrained or coerced its employees by isolated remarks

made over a period of fifteen months by five minor supervisory employees is not supported by substantial evidence; (5) the Board's inferential finding that respondent's entire course of conduct was unlawful is based upon the unfounded inference that Barr's talk to employees was evidence of an implacable hostility to the union.

■ We shall first consider the discharges of Medlin, Skinner and Smith. In considering the propriety of these discharges the question is not whether they were merited or unmerited, just or unjust, nor whether as disciplinary measures they were mild or drastic. These are matters to be determined by the management, the jurisdiction of the Board being limited to whether or not the discharges were for union activities or affiliations of the employees.

The reason assigned for Medlin's discharge was the pasting of union labels on furniture in respondent's plant "and other complaints." He was employed as an elevator operator on December 4, 1942, and was discharged June 16, 1943. The Board found that Medlin "did in fact paste one label and admitted doing so." It appears from the evidence that there had been promiscuous pasting of labels on company property, and repair work that was expensive, such as repainting, had to follow the removal of the labels. When Medlin was discharged he protested against being discharged for pasting the label and was informed that the discharge was based upon past complaints as well. These may be summarized as follows: (1) A complaint in January, 1943, for failing to give prompt service to customers on "house sales"; (2) a complaint in February, 1943, that he had used improper language in the presence of female employees; (3) a complaint in February, 1943, that he was giving poor service in handling the schedules of his elevator; (4) a complaint in May, 1943, that he had visited with employees, interfering with their work during working hours; (5) a complaint in May, 1943, that he was found talking and laughing and having a regular picnic with a number of the female employees in the plant. Each of these five complaints was discussed with Medlin and

he was warned of the necessity of caution. After the second and fifth complaints he was moved to a different elevator in the hope of correcting the situation, and after the fifth complaint he was specifically warned that a further breach of discipline would result in his discharge. This evidence was undisputed.

Medlin was active in union affairs and wore a button. In January, 1943, he became union steward of respondent's elevator department and subsequently received some publicity for his contribution of an idea for a cartoon which appeared in the May 7, 1943, issue of the union bulletin, "The Spotlight." He testified that during an exchange of remarks between him and a Mr. Wood, five months before his discharge, he erroneously accused Wood of wearing an anti-union button, in reply to which Wood said that he, Medlin, should not be wearing a union button; that he should be ashamed of doing so, and that he would get along better if he were not a member of the union. Medlin did not work for or under Wood and Wood had nothing to do with his discharge. During his employment he had received three raises in pay, the third two weeks before he was discharged.

▮ It is not here contended that respondent would not be justified in discharging Medlin for defacing respondent's property and other admitted infractions of the proprieties, but it is contended that these were not the reasons but that his union affiliations and activities were the basis for this action. The burden of proof was, of course, upon the Board. There was no dispute that there numerous complaints relative to his conduct prior to his being discharged. As has been observed, he was twice moved to other elevators with the hope of correcting the situation, and he was warned that a further breach of discipline would result in his discharge. It is argued that there was a manpower shortage and that Medlin had been given increases in pay. However, even during a shortage of manpower, employers do discharge employees for cause and manifestly may be required to do so. The increase in pay would certainly be evidence that

respondent, then cognizant of his union affiliations and activities, was not hostile to him on that account. When he committed this last breach of conduct, he was, in accordance with the warning, discharged. There is, we think, no evidence that respondent had an implacable hostility to the union in the sense that it would take unlawful steps to prevent the employees from selecting the union as their bargaining agent. As we have observed, there were confessedly grounds justifying Medlin's discharge. The question as to proper discipline was a matter for the decision of the management in its discretion. Wyman-Gordon Co. v. National Labor Relations Board, 7 Cir., 153 F.2d 480. The mere fact that he was given raises in compensation indicated a willingness on the part of respondent to continue with him as long as there were no further infractions of the rules of his employment for he admittedly had some good qualities. We repeat there was cause for his discharge and his employer exercised the right of discharge. Fragmentary and unrelated suspicions are not sufficient in substance to transform a proper exercise of discharge into an improper one. American Smelting & Refining Co. v. N. L. R. B., 8 Cir., 126 F.2d 680; N. L. R. B. v. Sheboygan Chair Co., 7 Cir., 125 F.2d 436.

In this, as in the other discharge cases, the Board has apparently held that the speech of respondent's Labor Relations Manager, later considered in this opinion, was to be viewed "as part of respondent's entire course of conduct set forth in the intermediate report." The view that this speech was violative of the Act has, we think, been an influential factor in determining the Board's inferences. As we shall later point out, this speech was clearly within the guaranty of the First Amendment to the Constitution. It contained, neither directly nor indirectly, any threat of reprisal or coercion. It was made plain that respondent did not in any way desire to interfere with the employees in the exercise of their right to unionize. The following excerpts make this clear:

"Each employee is free to join or not to join this union, or any other union, as he wishes. Wards fully recognizes this privilege and assures every employee that his

opportunity with the company will be the same whether he is a union member or not. * * * Wards has no quarrel with the principle of collective bargaining. Wards stand ready at all times to bargain collectively with any union which had been selected by a majority of the employees in any appropriate bargaining unit."

We shall make further reference to this subject but it seems pertinent in connection with the discharges of the employees because the Board has inferred that the respondent was implacably hostile to the union. Here we think it proper as bearing upon the question of respondent's attitude toward unions to quote from its written instructions to House Managers and House Management Board Members as to its labor policy. In its instructions of August 25, 1942, it said:

"Labor relations are subject to government regulations. * * *

"The Company's policy is based, simply but emphatically, upon this principle: We Will Obey The Law. * * *

"Following is an outline of the requirements of the law. Acquaint yourself with this outline. Any act not in accord with it is contrary to the law, contrary to company policy, and not to be tolerated.

"1. Employees have the right to join, form or assist labor organizations. You must not interfere with, coerce or restrain the employees in the exercise of this right. You must neither discourage nor encourage employees in the matter of joining or assisting labor organizations.

"a. If employees ask your advice as to whether they should join a labor organization, you must tell them that you are not permitted to advise them. This is a question which each employee must decide for himself without influence from the management.

"b. You must not spy upon, have others spy upon, or otherwise engage in espionage concerning the organization activities of the employees.

"c. You must not make anti-union statements to the employees. This prohibition applies to 'Confidential' statements to individual employees as well as to public pronouncements.

"d. You must not permit outsiders the use of company premises for purposes of solicitation or other organizational activity. Company time and company property are not to be used by either employees or outsiders in the interest of labor organization.

"2. You must not interfere with, dominate, or contribute support to the formation or administration of any labor organization. * * *

"3. You must not encourage or discourage union membership by discrimination in regard to hire or tenure of employment or any term or condition of employment.

"a. You must completely disregard any knowledge you may have of the union affiliations of the employees in determining layoffs and discharges.

"b. Union members must be neither discriminated against nor favored—to do one is just as bad as to do the other.

"c. Be absolutely impartial in your treatment of union members and non-members alike.

"4. Collective bargaining. The company will bargain collectively with any labor organization which represents a majority of the employees in a proper bargaining unit. Centralized control of all bargaining is necessary to assure observance of the law and uniform handling throughout all the branches. * * *

"It is essential that this policy be fully understood and observed by every Ward person in a supervisory capacity. Be sure that all such people in your organization are acquainted with it. * * *"

Substantially the same instructions were reissued June 3, 1943, and were communicated to all supervisory employees. These instructions must be considered as a part of the background in determining the attitude of respondent toward unions. The respondent had in its employ between 1500 and 1600 employees during the times here in question, and it would indeed be remarkable if in the considered judgment of the management some discharges for disciplinary purposes were not necessary. The mere fact that Medlin was active in the union can not alone support a finding of discriminatory discharge because there is

here substantial evidence that the employer discharged him for cause.

Skinner was hired as a painter in November, 1942, in connection with repainting the plant. When this work was about to end in February, 1943, he was transferred to glazing and pipe covering. He was discharged July 8, 1943. The Board found that when he was transferred he was promised that the new job would be a permanent one. Skinner joined the union in December, 1942, became steward of the paint shop, and in May or June, 1943, became plant steward and chairman of the union's bargaining committee. On four occasions he presented grievances to the management and acted as spokesman for the committee. One of the grievances which he discussed was Medlin's discharge. Maness, Skinner's superior, testified that the reason for the layoff was that the glazing work was far enough advanced not to require a full time glazer. At the time of his discharge four painters were retained on respondent's payroll, but they had greater seniority than Skinner, and when he was transferred to glazing and pipe covering two painters having even greater seniority were laid off because not qualified to do glazing work. The glazing work, which was discontinued at the time of Skinner's discharge, had never been resumed up to the date of hearing, and the testimony shows that respondent did not propose to remove the damaged windows as they were interwoven with wire mesh.

There was testimony and the Board found that foreman West told Skinner early in June, 1943, that he was being watched and that he should be careful, and that this warning was repeated two weeks later. There was also testimony supporting a finding that Smith, another dischargee, was told in June, 1943, by Maness that Skinner was giving him a lot of trouble and that he, Maness, "would be compelled to get rid of him," and that he asked Smith to watch Skinner to see "what he does, see what time he is killing, and who he is killing it with, and where he goes."

The Board invoked respondent's supposed "anti-union motivation" in supporting its conclusion that but for such anti-union motivation, it would have found a place in its maintenance department in which to utilize Skinner's abilities at his regular rate of pay. The fact that Skinner had been told in February, 1943, that the glazing job would be permanent could not be construed to mean that it would be everlasting. It appears from the testimony, and the Board found, that just prior to his discharge, in consultation with the operating manager it was decided to abandon the replacement of some 1800 pieces of glass throughout the plant. The work was abandoned and has never been resumed. The union activities of Skinner are not sufficient in themselves to support an inference that they were the cause of his discharge. In N. L. R. B. v. Citizen-News Co., 9 Cir., 134 F.2d 970, 974, referrring to this principle it is said:

"The fact that a discharged employee may be engaged in labor union activities at the time of his discharge, taken alone, is no evidence at all of a discharge as the result of such activities. There must be more than this to constitute substantial evidence."

But it is claimed that there was substantial evidence of a desire to get rid of Skinner. Foreman West reprimanded Skinner for using company time in discussing union business with other employees at work, and in that connection he told Skinner "that he was being watched by the respondent, and that he should be careful." About two weeks later West again warned Skinner to be cautious because "they are watching you." This warning, the Board found, had reference to Skinner's union activities. From this the Board concluded that respondent was engaged in surveillance of his activities. Among the respondent's rules was a provision against taking company time for union business. Thus, in the Management Letter of August 25, 1942, it was stated that:

"Company time and company property are not to be used by either employees or outsiders in the interest of any labor organization."

In the letter of June 3, 1943, the following provision appears:

"You must not permit employees to engage in solicitation or other organization

activity while on company time. You must not permit anyone engaged in solicitation or organizational activities to interfere with an employee while the employee is on company time."

That these were reasonable regulations can scarcely be questioned. Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 157 A.L.R. 1081, 89 L.Ed. 1372; N.L.R.B. v. May Dept. Stores Co., 8 Cir., 154 F.2d 533; N.L.R.B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556; N.L.R.B. v. Edinburg Citrus Ass'n, 5 Cir., 147 F.2d 353. There is no doubt that Skinner was taking company time to discuss union matters with other employees while they were at work on respondent's premises, and that was the basis for the warning that he was being watched. There is no evidence that he was being watched for legitimate union activities. This is clearly shown by Skinner's own testimony from which the following is an excerpt:

"Q. As you went about your work, would there sometimes be interruptions? A. Yes, any amount of times.

"Q. Where would these interruptions arise, and how would they arise? A. Well, * * * you would see people that you would know, they would holler at you and they would say this, that or the other. * * * It is hard to tell what they would talk to you about, just casually, just for a few minutes at a time, not any longer periods. * * *

"Q. Occasionally would they stop to talk to you about grievances, conditions, or matters they considered to be grievances, Mr. Skinner? A. I tried to answer their questions just as short as I could and got on about my way.

"Q. As a result of that, were you reprimanded by any representative of the company? A. Yes.

"Q. By whom? A. Byron West."

Skinner testified that West's reprimand was the result of numerous complaints. He was not reprimanded for union activities but for indulging in such activities on company time, taking not only his own time but that of other employees. The warning that he was being watched

was a friendly warning in an attempt to have him refrain from devoting his time and that of his co-employees to union activities during working hours. There can be no reasonable objection to the surveillance of employees admittedly breaching company rules. In fact, we held in N. L. R. B. v. J. L. Brandeis & Sons, supra [145 F.2d 566], that "employing detectives to engage in surveillance of union representatives while in its store" was proper in order to prevent them from interfering with employees while at work. The remarks of Maness to Smith to the effect that Skinner was giving a lot of trouble and that Maness would have to get rid of him clearly have reference to his breach of the rule against taking the time of employees during working hours. Smith, according to the testimony, was asked to report "the time he is killing," and "who he is killing it with." The record shows without dispute that there were numerous complaints, some of which at least West discussed with Skinner, and there being legitimate cause for Skinner's discharge there can be no presumption that his discharge was an illegal one. Neither can any significance be attached to the fact that Skinner was not given other employment, in view of the evidence that no other painting, glazing or pipe covering work was available except that being done by other employees with greater seniority. According to the evidence there was no other work available for which Skinner was qualified, at comparable wage rates and respondent did not believe it proper to transfer employees to lower paid jobs. There was no evidence that respondent ever transferred employees to lower paid jobs. We think there is no substantial evidence sustaining the finding or conclusion that the discharge of Skinner was because of his union activities.

Smith, a machinist and welder, was hired by respondent in December, 1942. At that time he reported that he was a member of the International Association of Machinists, A.F. of L. Soon after entering the employment of the respondent he joined the C.I.O. So far as appears from the record he was not an officer, a member of any committee, the head of any department, or in any way active in the campaign

seeking to organize the employees of respondent. Sometime in February, 1943, he had a conversation with Mr. Collins, chief engineer at respondent's plant. In that conversation Collins referred to a strike at the plant in 1937, and Smith testified that:

"Mr. Collins told me that some of the C.I.O. thugs that were imported from out of town, I think Chicago, he mentioned, took him for a ride, quoting his words, somewhere and beat him up, and that he was put in a hospital for some length of time. He told me that any man that would become affiliated with a rat organization like that didn't have good sense."

Collins was apparently relating his personal experience and his conclusion was based upon the facts which he related. He was speaking, not on behalf of the respondent, but in a very personal sense. What he said was not in the nature of a threat of reprisal, nor was it coercion, but simply the expression of his personal opinion based upon his related experience.

On the afternoon of July 17, 1943, Smith and M. M. Bush, an engineer, became involved in an altercation. Bush, it seems, was a member of the A.F. of L., and he and Smith had on several occasions prior to this date had heated arguments as to the relative merits of the two organizations. Referring to this occasion the Board found that:

"As Bush was about to punch the engine-room time clock, Smith came out of the machine shop and spoke to him. Bush did not answer him and Smith demanded to know the reason for his truculence. Bush answered that he wished to have nothing to do with Smith, that he should tend to his own business, and that they would go their separate ways."

Incidentally, it appears that Smith was a man thirty pounds heavier than Bush. At the time of the affray which followed, he was working in the machine shop adjoining the engine room, the rooms being connected by a door. He left his machine running, went to the door and into the engine room, and notwithstanding the reply of Bush that he wanted nothing to do with him, Smith insisted upon pursuing the controversy which he had started. According to his own testimony, in reply to Bush's surliness or refusal to talk, he said, "That calls for an explanation and I am going to have it." While it is not necessary to determine who in fact was at fault, it seems to be clear that Smith was a large, pugnacious, domineering man. He left his own work without reason and entered the engine room, where he certainly proceeded to pick a quarrel, if indeed he did not incite a fight. Whatever Bush may have said or done was not in the line of duty, nor was he acting or speaking in a supervisory capacity on behalf of respondent. It was the practice of respondent in the case of a fight between employees on company property and company time, to discharge either the aggressor, or both employees if the responsibility did not seem to be clear. Smith, as found by the Board, was a contentious man, and it appears that he had been in previous altercation with a fellow employee, and there were other complaints against him. There were three eye witnesses in addition to Bush, and when respondent investigated the matter all three of these eye witnesses asserted that Smith was the aggressor. As already observed, it is not necessary to determine which of these contestants was the aggressor. It appears that respondent's investigation, which included an interrogation of the three eye witnesses, besides Bush, conclusively showed that Smith, the large, contentious, quarrelsome man, was the aggressor. It also appears that Smith, immediately following the accident, gave his version of the incident to Maness.

Having inquired of the three eye witnesses and having heard Smith's own version of the fight, it could scarcely be said that respondent did not believe that Smith was the aggressor, and the record conclusively shows that the discharge was based upon the belief that he was the aggressor. At least there is no evidence warranting the inference that he was discharged because of his union affiliations or activities. Apparently when the investigation was made Smith was not available but he had previously given his version of the incident to Maness. It is argued that Smith was refused an opportunity to tell his side of the story, but Smith himself says that

496

he was given an opportunity to say anything to Mr. Maness that he wanted to say to him and he testified that immediately following the fight, while in the first aid room, "My wife and daughter was there at the time, Mr. Maness came up, saw what had happened, my side of the story, best I could tell him under the influence of a terrific blow." He further testified that he was fully conscious but a little shaky. Bush, it seems, was suspended for two days, but it can scarcely be said that this indicated anti-union bias because Bush was apparently more active in the A.F. of L. than Smith was in the C.I.O. There is no substantial evidence sustaining the finding and conclusion that Smith was discharged by reason of his union affiliations on activities.

Slanko, Sullivan and Gaylord were employed in the folder billing department in April, 1944. Slanko was a sorter and sign clerk. Her duties were to sort incoming work, assign it to the various employees, and collect the completed work. Sullivan and Gaylord were typists. All were members of the union, Gaylord being a steward. There were approximately twenty employees in the unit, including six typists under the supervision of Edna Kimak and Department Head E. C. Colvin. On April 12, 1944, union employees at the respondent's plant in Chicago went on a strike, and on April 13, the Kansas City employees also struck but returned to work the following day, although the Chicago employees remained on strike. Before the strike there had been some re-routing of orders received by the Chicago office to the Kansas City branch, and members of the union believed that an increase in this re-routing had occurred and that they were being used to break the strike in Chicago. The evidence revealed, however, that there was no increase in Chicago orders. At a union meeting held April 17, 1944, the members agreed not to process Chicago orders. Thereafter, in assigning the typing work, Slanko sought to give her Chicago orders to Gaylord and Sullivan, who set them aside without processing and at the end of the day Slanko withheld them without calling her superiors' attention to that fact. She continued withholding Chicago orders through April

18, 19 and 20, when Kimak discovered that fact and reported it to Colvin, who interviewed the three employees and told them that they would have to process the Chicago orders or leave the plant. They refused and were discharged. The Board found that:

"By refusing to process Chicago orders, Slanko, Sullivan, and Gaylord engaged in lawful assistance of their union protected by Section 7 of the Act. Hence, the respondent could not lawfully discharge them nor refuse to reinstate them merely because they had exercised such rights."

It was implied in the contract of hiring that these employees would do the work assigned to them in a careful and workmanlike manner; that they would comply with all reasonable orders and conduct themselves so as not to work injury to the employer's business; that they would serve faithfully and be regardful of the interests of the employer during the term of their service, and carefully discharge their duties to the extent reasonably required. 35 Am.Jur. p. 514. Any employee may, of course, be lawfully discharged for disobedience of the employer's directions, in breach of his contract. N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; N. L. R. B. v. Columbia Products Corp., 2 Cir., 141 F.2d 687. While these employees had the undoubted right to go on a strike and quit their employment, they could not continue to work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition, or refuse openly or secretly, to the employer's damage, to do other work. C. G. Conn, Ltd. v. N. L. R. B., 7 Cir., 108 F.2d 390; N. L. R. B. v. Condenser Corp., 3 Cir., 128 F.2d 67; N. L. R. B. v. Mt. Clemens Pottery Co., 6 Cir., 147 F.2d 262.

Since these employees were lawfully discharged, they did not remain employees. Sec. 2(3), National Labor Relations Act, 29 U.S.C.A. § 152(3). They were therefore not entitled to reinstatement to their former positions. N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599;

Loveman, Joseph & Loeb v. N. L. R. B., 5 Cir., 146 F.2d 769; C. G. Conn, Ltd. v. N. L. R. B., supra; N. L. R. B. v. Mt. Clemens Pottery Co., supra. The Board was in error in holding that by refusing to process the Chicago orders these employees engaged in lawful assistance of their union, protected by Section 7 of the Act. They were not on a strike; they did not leave the premises nor the employment. There being an implied obligation on the part of the employees to obey the reasonable instructions of the employer while the employment continued, their refusal to do so was proper ground for their discharge, and having been properly discharged there was no duty on the part of respondent to reinstate them. N. L. R. B. v. Fansteel Metallurgical Corp., supra; Loveman, Joseph & Loeb v. N. L. R. B., supra.

On January 4 and 5, 1944, about a week preceding the election, all employees of the respondent at its Kansas City plant were addressed by John A. Barr, respondent's Labor Relation Manager. Printed copies of his remarks were later distributed to all employees. Concerning these remarks, the trial examiner made findings which were adopted by the Board, reading in part as follows:

"The respondent conducted its meetings on its property and attendance was necessarily, in effect, compulsory. Barr took pains to point out that in the opinion of the respondent, the union had at all times behaved in a manner to bring discredit upon itself, that the respondent had recently filed a damage suit against it, and that the employees were now to vote on the question of whether they desired to be represented by it. Having thus discouraged them against remaining or becoming members of the union, he followed with a demonstration of the futility of their doing so by stating that the respondent was unalterably opposed to the closed-shop, the normal goal of unions in contract negotiation. The respondent thus served notice upon its employees that it would not bargain with the union, should they choose it as their representative, respecting this vital subject despite the fact that the closed-shop is recognized by the Act and has been stated by the Supreme Court in National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799, to be the frequent subject of negotiation between employers and employees. Their timing, the circumstances of their utterance and publication, and their content, taken in conjunction with the unfair labor practices of the respondent found herein both before and after the election, render it plain, and the undersigned finds, that Barr's statements were no mere expressions of the respondent's opinion, protected by the First Amendment, but were intended to and did in fact interfere with, restrain and coerce its employees in the exercise of the rights guaranteed in Section 7 of the Act."

The Board seems to have given no consideration to the course of conduct of the union which preceded and gave rise to these remarks. Barr's talk was primarily concerned with answering many charges published by the union in a periodic publication entitled, "The Spotlight." These bulletins are presented here in two volumes comprising some 454 pages. Concerning this publication, Barr said:

"This union has been publishing and distributing to the employees at both Chicago and Kansas City a paper called 'The Spotlight.' The Spotlight has been issued by the union to tell the employees over and over again, that the company is unpatriotic, that the company cheats the employees, that the company maintains rotten labor conditions and engages in corrupt dealings, that the company violates the law, and so forth. By this program of libelous and false publications, the union has attempted to destroy Ward's managerial organization and to create, among the workers, disrespect for the managers and supervisors and contempt towards the company. Because of the libelous and abusive nature of the union's publication, the company has recently filed suit in the courts at Chicago to stop the publication of these untruthful statements and to collect damages for the harm they have done."

The truth of Barr's recitals is not challenged and we quote from a few of the accusations appearing in various issues of "The Spotlight." In the April 7, 1943, issue it referred to the chief executive of respondent as "a person devoid of all prin-

ciple and patriotism in this hour of our country's greatest need, * * * surrounding himself with the 'little Hitlers of America.'" In the same issue it referred to him as "attempting to cause disunity and disruption on the home front," and as "labor's greatest enemy." In another issue the company's executive is referred to as a "Fascist minded individual." In this issue it was asserted that, "The time has come to destroy the subversive propaganda agents of Hitler." In a special issue dated June 19, 1943, a non-union employee was referred to as a "rat," and the same issue charged that respondent "has been despoiling the children of the northeast district for years." The Spotlight described working conditions at respondent's plant as "rotten," and the company was accused of operating a "vicious speed-up." In the issue of June 30, 1943, it was said that Medlin was fighting the attempts of respondent to maintain a blacklist and that "the maintenance of a blacklist was declared illegal years ago, but Wards figure that their attorneys, who have to come in from Chicago, can pull them out of any skull-duggery that they decide to do." It was also charged in The Spotlight that respondent was attempting to secede from the United States "by refusing to live up to the laws of this country of ours." In another issue it was charged that respondent was "unpatriotic and un-American," and that it "had always used misguided employees for its foul purposes." These few illustrations characterize the defamatory and inflammatory character of the publication which was the organ of the union, expressing its hostility and animosity toward respondent during the period referred to. Although these attacks are not considered by the Board, we think they furnish a setting which indicates that respondent was meeting and joining issue before its own employees with those who were assailing it. It confessedly had a right to defend its reputation, to speak for itself before its employees whose loyalty it had a right to ask, and the right to prove itself worthy of that loyalty. It was not required to stand mute. As said by the Fifth Circuit Court of Appeals in Humble Oil & Refining Co. v. N. L. R. B., 113 F.2d 85, 89:

"We do not think that the law, any more than common sense, would require the employer to stand as a sheep before his shearers dumb, not opening his mouth. The right of free speech touching his own interests was involved."

We held in N. L. R. B. v. J. L. Brandeis & Sons, supra, that the employer had a right to express his opinion in regard to union matters. We there expressed the view "that an employer may disseminate facts within the area of dispute, may even express his opinion on the merits of the controversy even though it involves labor organizations, may indicate a preference for individual dealings with employees, may state his policy with reference to labor matters, and may express hostility to a union or its representatives." As has already been observed, it was made plain by Barr that respondent did not in any way desire to interfere with the employees in the exercise of their right to unionize; that each employee was free to join or not to join the union or any other union; that it recognized this privilege and "assures every employee that his opportunity with the company will be the same whether he is a union member or not." It was also said that the respondent "stands ready at all times to bargain collectively with any union which has been selected by a majority of the employees in any bargaining unit." In his talk he urged each employee to vote as he pleased. The right of free speech guaranteed by the First Amendment is not limited to any class and is not denied an employer by the terms of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. It is only the abuse of that right in attempting to coerce employees that is forbidden by the Act. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; N. L. R. B. v. J. L. Brandeis & Sons, supra.

It is argued that compulsory attendance at the meetings was a species of coercion. The employees attended in groups and certainly employers have the right to meet their employees for discussion and presentation of matters of policy of mutual interest. In the instant case the employees were paid for the time spent at the

meetings. The First Amendment is concerned with the freedom of thought and expression of the speaker or writer, not with the conditions under which the auditor or listener receives the message. One need not, as a condition precedent to his right of free speech under the First Amendment, secure permission of his auditor. The First Amendment does not purport to protect the right of privacy, nor does it require that the audience shall have volunteered to listen. Thus, in Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313, the Supreme Court held invalid a city ordinance prohibiting the house to house distribution of handbills, although the validity of the ordinance was urged as a protection to the unwilling householder's right of privacy. It appeared in that case that handbills distributed by Martin and his fellow Jehovah's Witnesses were forced upon unwilling recipients, but the Supreme Court held the ordinance violative of the First Amendment. Speech is very frequently invoked as a means to persuade those who do not agree with the speaker and may not even wish to hear him. It was held in Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, that picketing was within the protection of the First Amendment and the protection is not lost by the misconduct or incivility of the speaker. Cafeteria Employees Union v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L. Ed. 58. In asking its employees to attend a meeting on company time, at which affairs of mutual interest to respondent and the employees were to be discussed, respondent was employing a convenient means of communicating with its employees. The employees were paid for attending and were not inconvenienced in the least. If they were influenced against their will by the arguments presented, this was a legitimate consequence of free speech and presumably one of its purposes. Free speech is not to be limited to ineffective speech. As said by the Supreme Court in Thornhill v. Alabama, supra [310 U.S. 88, 60 S.Ct. 745]:

"Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests."

The occasion on which the employer elects to utter his thoughts is not to be considered as an element of coercion. He is as free to speak at one time as another. N.L.R.B. v. American Tube Bending Co., 2 Cir., 134 F.2d 993, 146 A.L.R. 1017; Continental Box Co. v. N. L. R. B., 5 Cir., 113 F.2d 93; N. L. R. B. v. West Kentucky Coal Co., 6 Cir., 152 F.2d 198.

The First Amendment does not prohibit the communication of ideas but rather guarantees that right. Such a prohibition or restraint upon the freedom of speech is to be imposed only in the clearest cases. As said by the Supreme Court in Thomas v. Collins, supra [323 U.S. 516, 65 S.Ct. 322]:

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger."

The statement by Barr that action for injunction and damages had been commenced in Chicago is said to have discouraged membership. There is no claim, however, that the statement was false or misleading, nor was it a matter that might not well be considered by the employees. What future liability, if any, they might incur by joining the union was clearly a proper matter for consideration. The simple statement of the fact of the commencement of a lawsuit in a foreign jurisdiction for acts that could not result in any possible responsibility to the workers of respondent at Kansas City could not, we think, be distorted into an ominous threat of civil and criminal liability against the workers at the Kansas City plant.

The Board criticizes Barr's remarks for their declared opposition to the closed shop, and it is urged that this amounted to serving notice upon the union that respondent would not bargain "re-

specting this vital subject." The only reference to the closed shop in the National Labor Relations Act is to the effect that nothing in the Act should preclude an employer from making an agreement with a labor organization, with certain exceptions not here pertinent, requiring as a condition of employment membership in a particular union, if such union is the representative of the employees as provided in· the Act. In the remarks of Barr there was no refusal to· bargain collectively with the bargaining agent when designated, and the statute merely authorizes but does not purport to compel the employer to recognize the closed shop. The most that can be said is that bargaining for a closed shop or for a signed agreement with the employer is a frequent subject of negotiation between employer and employees. There is no indication that there would be a refusal to negotiate, but on the contrary the right of organization and of collective bargaining by the employees is definitely and expressly recognized in Barr's remarks. Again we recur to the declaration found in N.L.R.B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 348, 86 L.Ed. 348, that the Act does not enjoin the employer "from expressing its views on labor policies and problems." Reference to a policy opposed to the closed shop was not, we think, improper and it has the implied approval of other courts. Continental Box Co. v. N.L.R.B., supra; N.L.R.B. v. Blossom Products Corp., 3 Cir., 121 F.2d 260; N.L.R.B. v. American Tube Bending Co., supra. But it is claimed that the remarks of Barr were so entwined with other acts of respondent as to become a part of a complete pattern of unlawfulness. In this connection we observe that we have considered the other acts referred to and have found them not violative of the National Labor Relations Act.

It is also urged that the timing, the circumstances of utterance and publication, and the unfair labor practices of respondent as found by the Board, both before and after the election, were intended to interfere with, restrain and coerce the employees in the exercise of the right guaranteed in Section 7 of the Act. Referring to this finding, we think what is said by the Supreme Court in Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 187, 61 S.Ct. 552, 555, 85 L.Ed. 836, 132 A.L.R. 1200, is here apposite. It is there said:

"It is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality."

What took place after the speech certainly can not be made the basis of a finding of what one would understand by Barr's remarks, and, as already observed, the discharges of those employees were justified. At the time of the speech Medlin, Skinner and Smith only had been discharged. These discharges occurred some eight months before the speech and we have found them to have been proper. In a large establishment of necessity discharges must frequently occur.

The First Amendment is intended to assure a privilege that in itself must be so actual and certain that fear and doubt are absent from the individual's mind, or the freedom is but an abstraction. If the speaker must hesitate before uttering his thoughts, if he must weigh and nicely balance every word so· as to determine whether what he is about to say is permitted or forbidden, the guaranty tendered by the Constitution is little more than theoretical. He is "wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. Such a distinction offers no security for free discussion." Thomas v. Collins, supra. If subtleties may be invoked as the basis for an inference that non-coercive remarks may have had an "altered import" in the minds of the listeners, any employer would be subjected not only to the "varied understanding of his hearers," but also subjected to the chance of what the Board might infer. We think such a doctrine would take away all "security for free discussion." We are of the view that there is no evidence which could reasonably be said to give to Barr's remarks the import of a covert threat. No specific utterances of Barr have been pointed out as having such import, and the guar-

antees of the First Amendment can not be "defeated by insubstantial findings of fact screening reality." Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., supra; N.L.R.B. v. Ford Motor Co., 6 Cir., 114 F.2d 905; Budd Mfg. Co. v. N.L.R.B., 3 Cir., 142 F.2d 922.

■ It remains to consider the finding of the Board that the respondent interfered with, restrained and coerced its employees by various isolated remarks made over a period of fifteen months by some five minor supervisory employees in a plant employing over 1600 persons. These facts have already been stated and considered in connection with the discharges of various employees and it would seem quite unnecessary again to pass in detail upon them. It appears without dispute that instructions as to respondent's labor policy definitely and unequivocally proclaimed the right of employees to join, form or assist unions and forbade interference with any union activities on behalf of the employees. They also forbade anti-union discrimination in any form. These instructions were in force during all the times here in question. Barr's speech of January 4, 1944, clearly reflected the policy and attitude of respondent in this regard. Addressing ourselves to a similar situation in N.L.R.B. v. Brandeis & Sons, supra, we said:

"In considering these remarks it must be borne in mind that respondent had consistently proclaimed, both by spoken and written words, its fixed policy that employees were free to join or not to join a union and to vote accordingly without fear of reprisals from respondent. * * * When, as here, an employer has clearly defined his attitude of noninterference the expressions of minor supervisory employees to the contrary must be regarded as their individual views—they speak without authority from their employer."

We have already held that these acts were not improper and hence they can not be considered in connection with other facts to support a finding that the employer was guilty of unfair labor practices. Chance remarks can not be held to constitute interference where as here, the employer's attitude has been definitely and emphatically announced and adhered to. In view of the respondent's explicit instructions, the isolated remarks of these employees can not be considered as reflecting the policy of the management. N.L.R.B. v. J. L. Brandeis & Sons, supra; N.L.R.B. v. Shenandoah-Dives Mining Co., 10 Cir., 145 F.2d 542.

The petition for enforcement of the order to cease and desist is therefore denied.