## NATIONAL LABOR RELATIONS BOARD v. EDINBURG CITRUS ASS'N.

### No. 11188.

Circuit Court of Appeals, Fifth Circuit.

Jan. 22, 1945.

---

354

Alvin J. Rockwell, Gen. Counsel, and Malcolm F. Halliday, Associate Gen. Counsel, both of Washington, D. C., and Louis S. Penfield, Regional Atty., of Cincinnati, Ohio, for petitioner.

J. E. Wilkins and Scott Toothaker, both of Mission, Tex., for respondent.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The National Labor Relations Board asks enforcement of its order that Edinburg Citrus Association cease and desist from discouraging membership in a labor organization and from interfering with its employees in exercising their right of self-organization, and that it reinstate Opal Spurlock and Burnell McElhaney to their positions with back pay.

■ The Association denies that commerce is so involved as to give the Board jurisdiction, and avers that its employees are "agricultural laborers", specially excepted from the operation of the National Labor Relations Act by Section 2(3), 29 U.S.C.A. § 152(3). The Association is a co-operative corporation composed of Texas citrus fruit growers, which processes and packs only their fruit, and sells it in Texas to another company, which in turn ships most of it in interstate commerce, to a value of about $500,000 per year. Its crates and boxes and other supplies, costing about $100,000 per year, are bought in Texas from another company which imports about half of them in interstate commerce. While neither the Association nor its employees are engaged in interstate commerce, the stoppage of its operations by labor troubles would affect at once and to a considerable extent the flow of interstate commerce, as the Board found. This is enough to give it jurisdiction. 29 U.S.C.A. §§ 152(7), 160(a); N.L.R.B. v. Tex-O-Kan Mills Co., 5 Cir., 122 F.2d 433.

■ The employees are engaged in sorting and packing the fruit for market. It is done on a large scale in a large plant owned by the corporation. The employees do no field work and the corporation raises no fruit. Although packing fruit in the orchard in connection with its gathering by the producer would probably be agricultural labor, when the fruit raiser turns it over to a large packing plant to be mingled with the fruit of others, processed, packed and sold, the work becomes commercial rather than agricultural. North Whittier Heights Citrus Asscn. v. N. L. R. B., 9 Cir., 109 F.2d 76. Compare Chester C. Fosgate Co. v. United States, 5 Cir., 125 F.2d 775, in its interpretation of "agricultural labor" in the Social Security Act, 42 U.S.C.A. § 301 et seq., before the meaning of the term was altered by amendment, and Lake Region Packing Asscn. v. United States, 146 F.2d 157. The Association's workers in its packing plant are not agricultural laborers, though handling agricultural products.

■ As to the unfair labor practices, the facts as found are that the two discharged employees worked in the packing shed at the more skilled and preferred work. The packers, all women and twenty-five in number, were Americans, while most

of the workers elsewhere, more than one hundred in number, were Mexicans. The packers the year before had a union which had not worked well, and they had abandoned it with bitterness. A few weeks before the discharges a C. I. O. affiliate began to unionize the whole plant, including Mexicans, into one union. Spurlock and McElhaney were active in promoting it in the packing shed, but only one other packer joined and she was not active. The other packers were strongly opposed. Killough, the manager, and Hyde, the assistant manager, each told the employees several times there was no objection to them joining the union, but they did not have to join to keep their jobs. Killough told his foremen to "keep their hands out of it one way or another", and told the workers in the packing shed that "if they wanted to join the union it was all right, and if they did not want to join that was all right too; they could do as they pleased, but he did not want them taking time off and running around and getting excited and causing lots of furor". Hyde also told some of them not to discuss it in working hours. Hyde, however, hired both of these women knowing they were union members. They were capable workers. Racial antipathies were involved and feeling was bad between Spurlock and McElhaney on the one hand and the other packers on the other. Not only did the latter resent the efforts of the former to unionize, but they accused them of unfair and even dishonest practices in the sharing of the work. Spurlock quit her job because of these differences, but Hyde rehired her. Finally during a noon rest period twenty of the women were in the rest room and a really violent scene arose touching the unionization. Spurlock and McElhaney left the room, and the others sent two of their number to Killough to see if he would discharge them on a petition signed by the majority. They so asked him, and he said that "if we intended to quit because we could not get along with two packers, that he wasn't going to let eighteen packers quit because they could not work with two others." The committee reported, and the eighteen packers wrote and signed a statement: "We the undersigned packers of Edinburg Citrus Assen. do hereby declare that the following packers, Opal Spurlock and Burnell McElhaney are and have been since their period of employment in this shed creating such a state of disturbance and unpleasantness that we do re-

fuse to work with them". Killough knew the signatures of his packers, and acting on this statement that afternoon he directed the discharge of the two women. They went to Killough and asked the reason, and he said "I imagine you know". They then showed their union button and organizer's card, and Killough asked, "What do these have to do with what you asked me?", and said to them, "Your union membership wouldn't make any difference one way or another". Hyde had nothing to do with the discharge. Some remarks by him to McElhaney that afternoon have no real bearing on it. Killough testified that to have lost eighteen packers that day would have shut down the plant, and that he did not discharge the two because of their union membership and activity. See N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433, 438.

This unfair labor practice by an employer is thus defined: "By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C.A. § 158(3). We do not think these facts make such a case. These women were hired with knowledge of their union membership, and one of them was rehired. At the time of their discharge they were told that their union membership made no difference. All the employees had been repeatedly assured that such membership was immaterial to the employer, and the employer's only insistence was that they should not get excited and waste work time over the question. There is no reason to doubt that the discharges were made because the other employees refused to work with these two, and not from a discriminatory motive. We do not agree with the Board in the idea that because a part of the workers' objection to these employees was their union activity, the employer necessarily ratified and adopted that as the ground of his action. There was no collusion between Killough and the eighteen. If the eighteen had been union members, and the two not, his action would probably have been the same. The professed object of the National Labor Relations Act is to prevent interruptions of work in plants to the detriment of commerce. That is the ground on which Congress undertook to legislate. We do not think this plant had to be shut down, or should again be thrown into confusion, because two employees are unacceptable as

coworkers to the others, whether the ground of it be just or unjust, or in part because of a union disagreement. There was here no employer discrimination within the meaning of the Act.

Other evidence of interference with organization seems to us insufficient. Most of it relates to objection to union discussion in work hours. It is well settled that an employer may so object. An outburst of impatience by Hyde on one occasion he promptly apologized for. We do not think there is substantial evidence of employer interference with self-organization.

We will accordingly refuse to enforce the order in this case.