NATIONAL LABOR RELATIONS
BOARD
v.
MONARCH TOOL CO.
No. 11899.

United States Court of Appeals
Sixth Circuit.
Feb. 8, 1954.

Fannie M. Boyls, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Alan R. Waterstone, Washington, D. C., on brief, for petitioner.

Stanley H. Fulton, Detroit, Mich., Nancy Jean Ringland, Goddard, Mc-Clintock, Fulton & Donovan, Detroit, Mich., on brief, for respondent.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

This cause comes here for review on the petition of the National Labor Relations Board for enforcement of its order, issued February 11, 1953, directed

against the respondent company in consequence of respondent's violation of section 8(a)(1) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. §§ 151, et seq., 158(a)(1).

The decisive issues presented are (1) whether the Labor Board properly found a violation of the Act by respondent in maintaining and enforcing a rule prohibiting the distribution of union literature and pamphlets on the parking lot of its plant; and (2) whether the board properly found that, in maintaining a rule prohibiting the solicitation of union membership in the cafeteria of the company's plant during non-working hours, respondent violated the aforementioned section of the Act.

Upon review of the entire record in the case, the Labor Board adopted the rulings, findings, conclusions and recommendations of the Trial Examiner. 102 N.L.R.B. 134. The findings of the Trial Examiner adopted by the Labor Board, which are found to be supported by substantial evidence, will be reviewed in some detail.

The respondent company, in 1938, promulgated rules, incorporated in subsequent manuals published and circulated by it in 1941, 1942, and 1946, which contained the following provision:

"Promotion in the shop by employees of outside interests of a social, business, religious, trade, or political nature is prohibited. The use of company property for such purposes is not allowed.

"No subscription for flowers, presents, or any other purpose will be allowed unless first approved by the department superintendent.

"Factory bulletin boards are intended as an official means of communicating information that concerns every employe * * * it is important that you read each notice as soon as it is posted."

The foregoing prohibitions were recognized in the collective bargaining agreements between respondent and a local independent union for the years from 1945 to 1950 by providing against the solicitation of union membership during working hours. However, the current contract executed on May 24, 1950, effective for three years, does not contain this prohibition against solicitation of union membership during working hours.

The Trial Examiner thus described the premises of respondent and set forth relevant facts and evidence:

"Respondent's plant, operated by 1600–1650 production and maintenance employees, is located approximately 7/10 of a mile from 'the public square' in Sydney, Ohio, a town having a population of approximately 12,000 inhabitants. About half of Respondent's employees reside outside the town limits and at various distances within a radius of 50 miles. The town has no public transportation system other than taxicabs. Employees, except those living within walking distance, reach and leave the plant by private automobiles for which Respondent has provided private parking lot facilities. Prior to November 8, 1951, a substantial number of employees were provided such accommodations on a lot known as the South parking lot, south of and adjacent to the plant. On that date, the Company opened its West parking lot with a capacity of 721 cars. Respondent thereafter discontinued the use of the South parking lot and erected an addition to its shop thereon.

"The West parking lot with which we are concerned, hereafter referred to merely as the parking lot, is located west of the plant and separated therefrom by railroad tracks of the B & O Railroad. It is entirely within company property lines and is completely fenced, except for gate entrances. The only ingress to the plant from the parking lot is by means of a pedestrian bridge leading from approximately the center of the east border of the parking lot, over the railroad tracks, to the west entrance to the plant. Except in case of emergency, automobile entrance to, and exit from, the parking lot is permissible only

through two gate entrances, approximately 20 feet wide, known as the South gate and the North gate. Traffic to these gates is brought from two main arteries—from Michigan Avenue to the South gate, and from Park Street to the North gate. Entrance to the South gate from Michigan Avenue, which runs in an easterly-westerly direction, is obtained by travel on Linden Avenue, approximately 18 feet wide, running in a northerly and southerly direction from Michigan Avenue, approximately 450 feet distant. The North gate borders directly on Park Street which runs east and west. Michigan Avenue, used not only for city traffic but also a designated State highway, has a hard surfaced roadway approximately 30 feet wide. Park Street, used by city traffic, has a similar roadway about 25 feet wide.

"For some time past, Respondent has employed 3 eight hour shifts—7 a. m. to 3 p. m., 3 p. m. to 11 p. m., and 11 p. m. to 7 a. m. Late in August 1952, when the plant employed about 1600 production and maintenance employees, a count of automobiles and their occupants entering or leaving the lot one hour prior to the beginning, or after the close, of each shift was made. The count disclosed that during such three hourly periods 275 automobiles, carrying 510 occupants, entered the North gate, and 340 automobiles, containing 641 occupants, entered the South gate, most of them concentrated in periods of 15–20 minutes prior to the beginning of each shift. The remaining 550 employees entered through the front entrance to the plant on Oak Street, or came by foot and entered either the North or South gates and then proceeded to the plant by means of the bridge crossing the railroad tracks. * * *

"Prior to November 8, 1951, and while employees were using the South parking lot, Union workers, whenever they found occasion to do so, took their posts at the north end thereof near the door forming the south entrance to the plant and there distributed circulars and leaflets pertaining to Union activities. Similar distributions took place on company property at the front entrance of the plant on Oak Street. During inclement weather, however, the distributions at both places were made in the presence of guards and foremen who not only refrained from objecting thereto, but on a number of occasions, during bad weather, invited the distributors to carry on their work inside the entrance. After the West parking lot was opened and until about February 22, 1952, principal distribution of Union literature and circulars was made by Respondent's employees in, or closely adjacent to, the vestibule entrance of the plant located at the east end of the bridge over the railroad tracks where it was likewise observed by guards and supervisors without objection.

"On February 22, 1952, Eugene L. Knoop, a union committeeman, and other Union supporters stationed themselves at the location last described and there solicited the signatures of Respondent's employees to a petition addressed to the Wage Stabilization Board asking that body to approve and expedite action on a proposed wage increase then pending before that Board. During the day, but on different occasions, plant guards told those engaged in that task to get off the company's property, that they were not allowed to engage in such activity and were breaking the company's rules. Notwithstanding the admonition of the guards, the men continued their task that day, but moved their activities to the parking lot side of the bridge. Circulation of union literature was continued there until about March 18 or 19, when one Davis was discharged by Respondent for an undisclosed cause. As a result of that discharge, a work stoppage occurred. On March 26, agreement was reached to have the employees return to work. On the same day, the Company published the following notice: 'There shall be no distribution or circulation of literature, petitions, or writ-

ten or printed matter of any description on any of the Company's premises.' On March 28, the Union agreed 'not to circulate literature in the company's parking lot or on company premises until the issue of the right to do so was decided by the National Labor Relations Board.' From March 26 to the date of the hearing, Union literature has been circulated among employees using the parking lot only *outside* the North and South gates of that lot, beyond the Company's property line."

The Trial Examiner found, further, that distribution of union literature and pamphlets outside the gates of the respondent's plant was not effective and was actually hazardous. It was pointed out that automobile drivers frequently approached the gate entrance at high speed and that, when weather conditions made traction difficult, the automobiles would skid past or dangerously close to those seeking to stop the vehicles for the purpose of circularizing the occupants of the automobiles. The hazard to those engaged in such tasks increased with the onset of darkness. When union workers stopped their cars just outside the gate, traffic would become jammed and irritation would frequently ensue among those whose entrance into the plant had been delayed. Such persons would drive hastily through the gate without stopping, thus creating a danger hazard to those seeking to distribute union literature. Moreover, in inclement weather, only some fifty per cent of the automobiles would stop at either gate to permit the distribution of union pamphlets and the like.

The conclusion of the Trial Examiner, approved by the Labor Board, was that the circulation of union petitions, pamphlets, and literature could not readily be conducted away from the premises of respondent and that the company's rule in question, relating to distribution on the parking lots adjacent to its plant, constituted an unreasonable impediment to the freedom of communication essential to the exercise of its employees' rights to self organization.

(1) Upon the highest authority, we think the conclusion of the Trial Examiner and the Labor Board is correct. National Labor Relations Board v. Le-Tourneau Company of Georgia [reported along with and under the style of Republic Aviation Corporation v. National Labor Relations Board], 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, directly supports their conclusion. The facts in that case were that two employees had been suspended for distributing union literature or circulars on the employees' own time, on company-owned and policed parking lots adajacent to the company's fenced-in plant, in violation of the longstanding and strongly-imposed company rule, adopted before there was any union organization activity about the premises. The rule forbade the distribution or circulation of handbills, posters, or any literature of any description on company property without first securing permission from the personnel department. The purpose behind the rule was to control littering and petty pilfering from parked automobiles. The opinion pointed out the difficulties of distributing the literature outside the parking lots. The Labor Board had found—and the Supreme Court approved the finding—that the application of the company rule to the distribution of union literature by the employees on company property, which caused the lay-offs, was an unfair labor practice under sections 8(1) and 8(3) of the National Labor Relations Act. In a footnote in 324 U.S. at page 802, 65 S.Ct. at page 987 of the opinion, the Supreme Court inserted approvingly a quotation from the Labor Board's opinion, which will not be rewritten here.

In the companion case concerning the Republic Aviation Corporation, the Supreme Court, in the same opinion, upheld the determination of the Labor Board that the promulgation and enforcement by an employer of a no-solici-

tation-on-its-premises rule during an employee's own time, which resulted in the discharge of an employee for "union solicitation," violated section 8(1) of the National Labor Relations Act and discriminated against the discharged employee under section 8(3) of the Act. See, also, National Labor Relations Board v. Lake Superior Lumber Corporation, 6 Cir., 167 F.2d 147, 150, 151, and cases there cited; National Labor Relations Board v. Caldwell Furniture Co., 4 Cir., 199 F.2d 267, certiorari denied, 345 U.S. 907, 73 S.Ct. 647, 97 L.Ed. 1343; National Labor Relations Board v. Carolina Mills, Inc., 4 Cir., 190 F.2d 675; National Labor Relations Board v. American Furnace Co., 7 Cir., 158 F.2d 376, 380; National Labor Relations Board v. Illinois Tool Works, 7 Cir., 153 F.2d 811, 816.

■ (2) In our judgment, the Labor Board found properly that the respondent had violated section 8(a)(1) of the National Labor Relations Act by maintaining a rule prohibiting the solicitation of union membership in the plant cafeteria during non-working hours, even though employees were paid during non-scheduled lunch periods. In the Republic Aviation Corporation case, supra [324 U.S. 793, 65 S.Ct. 984], an employee had been discharged for solicitation of union membership in the employer's plant by passing out union application cards to employees "on his own time during lunch periods." The Supreme Court upheld the Labor Board in holding this to be an unfair labor practice. The highest court quoted with approval from the Labor Board's opinion in the Peyton Packing Company case, 49 N.L.R.B. 828, 843, 844: "The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule

must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property. Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline." See also National Labor Relations Board v. Clark Brothers Co., 2 Cir., 163 F.2d 373, 375; Olin Industries v. National Labor Relations Board, 5 Cir., 191 F.2d 613, 617; National Labor Relations Board v. I. F. Sales Co., 6 Cir., 188 F.2d 931; Maryland Dry Dock Company v. National Labor Relations Board, 4 Cir., 183 F.2d 538, 542.

■ We find no merit in the motion of respondent to dismiss, in part, the petition of the National Labor Relations Board for enforcement of its order. The Board is entitled to have its order enforced as prayed, notwithstanding the fact that since its order was promulgated a new labor union has been chosen, is now bargaining representative of the employees of respondent, and has made a new labor contract with the respondent at variance with the contract in existence at the time the Labor Board decided this case. The Board's decision was rendered on February 11, 1953, and the new contract was not executed until April 11, 1953, between a local union of the A. F. of L., and the respondent company.

The petition of the National Labor Relations Board for enforcement of its order is granted, as prayed.