## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## ESSEX WIRE CORPORATION, a corporation, doing business as Essex Wire Corporation of California, Respondent.

### No. 15077.

United States Court of Appeals
Ninth Circuit.

Feb. 28, 1957.

Theophil C. Kammholz, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Norton J. Come, Samuel M. Singer, Myron S. Waks, Attys., NLRB, Washington, D. C., for petitioner.

Holt, Macomber & Graham, Franklin B. Orfield, San Diego, Cal., for respondent.

Before CHAMBERS and HAMLEY, Circuit Judges, and WESTOVER, District Judge.

HAMLEY, Circuit Judge.

The National Labor Relations Board here seeks enforcement of an order requiring Essex Wire Corporation to cease and desist certain labor practices, and to post notices that it will not engage in such practices.

Respondent company is engaged in the manufacture and sale of wire products in several states, including California.

The labor practices here in question occurred at the company's manufacturing plant in San Diego. The employees of that plant were represented in collective bargaining by Silvergate District Lodge No. 50, in behalf of Automotive Electric Lodge No. 1930 of the International Association of Machinists (I.A.M.). Several employees of the plant, however, became interested in United Mine Workers of America, District 50, unaffiliated (U.M. W.), as a possible bargaining agent. They began a membership campaign at the plant in behalf of that union.

When this activity came to the attention of the production manager, he sought the advice of the company's main office, in Detroit. He was advised to follow a "middle course" and to avoid any display of partisanship in the "factional" dispute, but to insist that no organizational activity be conducted during working hours. A company notice was then posted forbidding union campaigning "during working hours." The labor practices here in question, three in number, occurred shortly after the posting of this notice.

One of these practices had to do with the efforts of one of the employees, James A. Juhl, in obtaining executed U.M.W. membership application or authorization cards from other employees in the plant. On the day after he initiated this activity, Juhl was accosted by his foreman, Clyde Casey, who inquired whether Juhl was passing out membership cards. Juhl answered that he was, and, in answer to a further question, stated that he had obtained signatures on some of them.

Casey then remarked, "What are you trying to do, make a fool out of me?" Juhl replied, "No." Learning that Juhl then had the cards on his person, Casey said, "Don't you like your job here?" Juhl replied, "Yes." Casey then said, "Well, I want the cards in my office in five minutes." When this conversation had ended, Juhl returned the cards to the employees who had signed them. He advised the foreman of this action. The foreman then told Juhl that, in order for Juhl to campaign for another union, he would first have to notify "the front office," and must wait until the I.A.M. contract had expired.

The second labor practice in question involved conversations between the production manager and two employees, Juhl and James C. Hamilton. The production manager told each of these employees that rest periods were company time because employees were paid for that time, and that there must be no campaigning during rest periods.

The third criticized labor practice concerned Hamilton's wife, Mrs. Elizabeth Ann Hamilton. On two different occasions, she was approached at the plant by supervisory personnel and ordered to remove a U.M.W. button which she war wearing. This direction was given on the ground that the display of the button constituted union campaigning on company time. The I.A.M. adherents were then openly wearing buttons indicative of their loyalty to that organization. The company made no effort to require removal of the I.A.M. buttons.

The facts, as summarized above, constitute a fair resume of the examiner's findings of fact, which were adhered to by the board. Respondent's exceptions to the examiner's intermediate report and recommended order, while somewhat ambiguous, do not appear to question these findings, but only the conclusions of law drawn therefrom. The board so construed the exceptions in its consideration of the matter. In its brief before this court, however, respondent discusses the credibility of the witnesses, and argues that the board "relies upon a thin thread of vengeful accusations by disgruntled employees * * *."

██ If, as we are inclined to think, respondent's exceptions to the examiner's report and recommended order failed to challenge the findings of fact, those findings are not subject to question here.[1]

1. Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e); N. L.

R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 350, 73 S.Ct. 287, 97 L.Ed. 377.

In any event, it is our view that such findings are supported by substantial evidence on the record, considered as a whole. The findings are therefore conclusive as to the controlling facts, and will be so regarded.[2]

■ The board concluded that the act of the company foreman in demanding that Juhl surrender the executed membership cards he had in his possession was an unfair labor practice within the meaning of § 8(a) (1) of the act.[3]

Countering this conclusion, respondent contends that the order to surrender these cards was a reasonable method of assuring that employees would not campaign for a union during company hours. It is urged that if Juhl actually acquired these cards during authorized rest periods, it was incumbent upon him to so advise the foreman, but that he did not do so. Respondent also argues that nothing appears in the record to indicate that the foreman had anything else in mind but to return the cards at the end of Juhl's shift.

Assuming that the cards were demanded in an effort to enforce the rule against union campaigning on company time,[4] and that the foreman intended to return the cards at the end of the day, we are nevertheless of the view that the demand

was coercive with respect to the rights specified in § 7 of the act.

Possession of such cards, even for a temporary period, would enable management to inform itself as to the progress being made in campaigning for a then-unrepresented union. It would also make it possible for management to exercise surveillance over the union affiliations and activities of individual employees. Whether the company would be disposed to make such use of the cards is beside the point. As long as the opportunity is present, employees may have a real fear that this would be done. Such fear could well influence their inclination to execute such cards.

No case involving a similar labor practice has been called to our attention. However, the coercive tendency of remarks and questions concerning union campaigning, directed to employees by supervisory personnel, has been previously pointed out by this court.[5] In our view, a demand for surrender of membership cards in a union not then established in the plant is at least as coercive as such remarks and questioning.

We are therefore of the view that the demand that the union cards be delivered to the foreman was an unfair labor practice within the meaning of § 8(a) (1).

2. Section 10(e) of the act (29 U.S.C.A. § 160(e) ); Medo Photo Supply Corporation v. N. L. R. B., 321 U.S. 678, 681, 64 S.Ct. 830, 88 L.Ed. 1007.

3. Section 8(a) (29 U.S.C.A. § 158(a)) reads in part:
 "(a) It shall be an unfair labor practice for an employer——
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title * * *."
 Section 7 of the act (29 U.S.C.A. § 157) reads as follows:
 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such actitivites except to the extent that such

right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

4. The examiner and the board expressly found that Juhl did not collect the cards during working hours. There is nothing in the record to indicate that the foreman connected his demand for the cards with union activity during working hours. On the contrary, the evidence indicates that the demand was probably motivated by the idea that it was improper or undesirable for employees to campaign for one union when another union had the established bargaining rights in the plant.

5. N L. R. B. v. Globe Wireless, 9 Cir., 193 F.2d 748; N. L. R. B. v. West Coast Casket Co., 9 Cir., 205 F.2d 902. Cf. N. L. R. B. v. McCatron, 9 Cir., 216 F.2d 212.

■■ The board also concluded that the direction given Juhl not to carry on union campaigning during employee rest periods was an unfair labor practice within the meaning of § 8(a) (1) of the act.

In its brief, respondent questions the finding of fact to the effect that Juhl was given such an instruction. This contention has already been disposed of. Respondent does not question the legal conclusion that it is an unfair labor practice to forbid union campaigning during employee rest periods.

Absent special considerations relating to production or plant discipline, an employer may not issue a broad rule prohibiting union solicitation by its employees on company property. Republic Aviation Corporation v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. But working time is for work, and an employer is therefore entitled to prohibit union solicitation during working hours.[6]

A rest period, however, though included in the time for which employees receive compensation, is not working time within the meaning of this rule. It is therefore an unfair labor practice, within the meaning of § 8(a) (1) of the act, for an employer to broadly forbid union campaigning during such rest periods. Olin Industries, Inc. v. National Labor Relations Board, supra.[7]

■■ With regard to the third labor practice here in question—forbidding an employee to wear a U.M.W. button at the plant while permitting other employees to wear I.A.M. buttons—the board found this also to be an unfair labor practice within the meaning of § 8(a) (1) of the act.

Here again, respondent's argument is directed against the finding of fact and not the conclusion of law. As already stated, we accept the finding of fact.

In the absence of special considerations relating to plant discipline, an employer's prohibition against the wearing of the usual union insignia is an unwarranted interference with the employee's right to engage in organizational activity. Republic Aviation Corporation v. National Labor Relations Board, supra. No excusatory circumstances were shown to exist in this case.

The discriminatory way in which supervisory personnel proceeded, in requiring removal of a U.M.W. button while permitting I.A.M. buttons to be exhibited, is also an aggravating circumstance. By so handicapping the organizational campaign of one of the two competing unions, the employer interfered with that freedom of choice as to collective bargaining agent which is guaranteed by § 7 of the act. International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 78, 61 S.Ct. 83, 85 L.Ed. 50.

We conclude that the action taken by the management of respondent company with respect to the wearing of U.M.W. buttons was an unfair labor practice, as defined in § 8(a) (1) of the act.

■ Finally, respondent argues that we are here dealing with isolated and sporadic incidents. Because of this, it is contended, a conclusion that they constitute unfair labor practices is unjustified, or, if justified, that issuance of a cease and desist order is nevertheless unwarranted. National Labor Relations Board v. Montgomery Ward & Co., note 6, supra; National Labor Relations Board v. England Bros., 1 Cir., 201 F.2d 395; and Ohio Associated Telephone Co.

6. N. L. R. B. v. Edinburg Citrus Ass'n, 5 Cir., 147 F.2d 353; N. L. R. B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486; Olin Industries, Inc. v. N. L. R. B., 5 Cir., 191 F.2d 613, certiorari denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332.

7. See, also, N. L. R. B. v. Monarch Machine Tool Co., 6 Cir., 210 F.2d 183, 187,

certiorari denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1109. As in the case of all union activity on company premises, there may be special circumstances relating to production or discipline which will warrant the imposition of some limitation on union activity during rest periods. No such circumstances were shown or contended for in this case.

v. National Labor Relations Board, 6 Cir., 192 F.2d 664, are cited by respondent in support of this argument.

In the case before us, unlike the cited cases, the incidents, while few in number, involved more than isolated and chance remarks, interrogation, or warnings later repudiated and never enforced. In our case, there was, in each instance, positive and purposeful action by management in the form of a specific and direct order or demand. It was made clear to the employee concerned that obedience was expected and that disobedience would result in discipline. However fair and proper the company's basic policy with respect to such union activity may have been, the criticized practices were of a nature which warranted the board in characterizing them as unlawful and in ordering that respondent cease and desist.

A decree will be entered enforcing the board's order.