**WAH CHANG CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 16652.

United States Court of Appeals
Ninth Circuit.

June 25, 1962.

Weatherford & Thompson, and Orval N. Thompson, Albany, Or., for petitioner.

Stuart Rothman, General Counsel, Thomas J. McDermott, Dominick L. Manoli, Associate General Counsels, Marcel Mallet-Prevost, Asst. General Counsel, Melvin Pollack, Earle W. Putnam, Attys., National Labor Relations Board, Washington, D. C., and Thomas P. Graham, Jr., Director, National Labor Relations Board, Seattle, Wash., for respondent.

Before CHAMBERS and HAMLEY, Circuit Judges, and EAST, District Judge.

EAST, District Judge.

## NATURE OF ACTION

This case came before the Court upon the petition of Wah Chang Corporation, a corporation of the State of New York, doing business in Albany, District of Oregon (Chang), to review and set aside the order of the respondent National Labor Relations Board (Board) affirming its trial examiner's findings and conclusions (Examiner), issued on October 14, 1959, which order held that Chang had engaged in unfair labor practices in violation of § 8(a) (1), (2) and (3) of the Labor Management Relations Act, as amended (Relations Act), Title 29 U.S. C.A. § 158.

Chang is engaged in interstate commerce, and the alleged unfair labor practices allegedly occurred at its plants in Albany. The Board, in its answer to Chang's petition, has cross-petitioned for enforcement of its order (Tr. 49).

## JURISDICTION

This Court has jurisdiction of the proceedings under §§ 10(e) and (f) of the Relations Act, 29 U.S.C.A. § 160(e, f).

## STATEMENT OF CASE

Chang's operation at Albany consists of four separate plant buildings where it produces reactive and rare metals which include zirconium, hafnium, columbium and tantalum. These metals are very valuable and extremely hard to produce. Their proper processing requires constant attention and alertness of the operators. (Tr. 112.)

Zirconium and Allied Metals Union is a so-called company union (Union), and was bargaining agent for the production and maintenance employees of Chang as the result of a Board-conducted election. Chang and Union entered into a working bargaining-agent agreement dated August 1, 1957, which had, by its terms, expired on July 31, 1958. However, the parties by mutual consent extended this agreement, and negotiations were being had between the parties for renewal when Metals Trade Council of Portland and Vicinity, AFL–CIO (Council) decided to attempt to secure enough signatures of the production and maintenance employees of Chang to enable Council to request a Board-conducted election. At no time did Council advise Chang that it was going to solicit Chang's employees for signatures on Council's authorization cards. For the purposes of this case, we will accept the Board's findings of fact, stated in the Board's brief to be, briefly, that the Board found that Chang unlawfully assisted Union by:

(1) "Maintaining and giving effect to a contract provision [Article XXII, *infra*] requiring permission from Union for employees to engage in Council's solicitation on Chang's premises;

(2) "That [Chang] discriminatorily discharged four employees

"(a) William L. Stutheit

"(b) Ronald E. Graham

"(c) Allen W. Wallace

"(d) Quinton D. Dombrowsky

for soliciting in behalf of [Council];

(3) "That [Chang] interfered with the organizational rights of its employees under the Act by interro-

gating them regarding their membership and activities in behalf of [Council]; and

(4) "By threatening them with discharge for engaging in such activities."

The important Article XXII, contained in the October 8, 1957 one-year contract, provided:

"There shall be no soliciting or petitioning in the plants without the consent of the company [Chang] and the Union [Metals Union aforesaid]."

The Board insists that the record as a whole reveals substantial evidence to sustain each of the four charges and findings and that its order is valid and enforceable. Chang avers the review involves two basic questions:

(1) Were the four employees discharged by Chang because they solicited signatures of Chang's employees during working hours and while such employees were on duty, or were these employees discharged [merely] for [their] activities on behalf of Council?

(2) Did the acts and conduct of some of Chang's foremen interfere with, restrain, and coerce its employees in the exercise of rights guaranteed in Section 7 of the Relations Act, and thereby constitute an unfair labor practice within the meaning of Section 8(a) (1) of the Relations Act?

We deal with the Board's charges, findings and conclusions in the order set out numerically above; there may, however, be some overlapping instances.

At this point we admonish ourselves that the authorities are legion to the effect that if there is any substantial evidence in the record as a whole to support the charges, findings and conclusions of the Examiner as may have been adopted by the Board, such findings and conclusions of the Examiner must stand, and are not subject to a judicial rehash. Yet, if Examiner's determinations and findings are unsupported by any substantial evidence in the record as a whole, or if his inferences drawn from the evidence before him are unwarranted, his conclusions may be judicially reviewed, and, if found wanting, set aside. Flemming v. Huycke, 284 F.2d 546 (9 Cir. 1960). Except for one legal principle involving the full meaning and application of Article XXII aforesaid, this review must be resolved from a search and appraisal of the entire evidentiary record.

## LEGAL INTERPRETATION OF ARTICLE XXII

Recalling that the language of Article XXII is "There shall be no soliciting or petitioning in the plants without the consent of [Chang] and [Union]," this provision, so far as "soliciting without the consent of [Chang] and [Union]" may well be violative of the Relations Act. The Examiner's inference that the real purpose of Article XXII was "to obstruct or impede" rival union activities on behalf of Council is evident not only from the requirement prohibiting "soliciting without the consent of [Chang] or [Union]" but also because it banned solicitation "in the plants" without regard to *during* [emphasis supplied] working hours, and, hence, constituted an unreasonable impediment to organization, is only the Examiner's personal inference and legal interpretation of the wording of Article XXII. We believe it to be an unwarranted inference and unsound legal interpretation and, further, that such an unwarranted inference and unsound legal interpretation cannot be a buttress or utilized by the Board in meeting its burden of proof that Chang discharged any one or more of the four dischargees because of "soliciting" activities.

"Employer rules prohibiting organizational solicitation are not in and of themselves violative of the Act, for they may duly serve production, order and discipline. See Republic Aviation Corp. v. [National] Labor [Relations] Board, 324 U.S. 793, [65 S.Ct. 982, 89 L.Ed. 1372]; [National] Labor [Relations] Board

v. Babcock & Wilcox Co., 351 U.S. 105 [76 S.Ct. 679, 100 L.Ed. 975.]" N.L.R.B. v. United Steelworkers of America, 357 U.S. 357, 361–362, 78 S.Ct. 1268, 2 L.Ed.2d 1383.

"But working time is for work, and an employer is therefore entitled to prohibit union solicitation during working hours.[6] [1] N.L.R.B. v. Essex Wire Corp., 245 F.2d 589, 593 (CA 9 1957).

Article XXII, under any logical and reasonable interpretation, includes the unlawful prohibition of "soliciting or petitioning" without the consent of [Chang] and [Union], which in and of itself is an unfair labor practice, but it also includes the lawful prohibition of "soliciting or petitioning" *in the plants* [emphasis supplied.] Query: Does the absence of the words "during working hours" following the word "plants" change and negate the valid rule against and prohibiting soliciting or petitioning in the plants during working hours? We think not; the reasonable and logical inference is that the prohibition against the "soliciting or petitioning in the plants" necessarily includes and means during working hours and does not mean during closed or shutdown periods of operation. It is unrealistic and absurd to say or try to assert that an employee actually on the premises and within one of the four plants within the reasonable area of his assigned work station, and within and during the time of his regularly assigned shift or duty period, clothed in proper working gear, is not inferentially and actually in the plant "and during working hours."

Therefore, the Examiner's inference and legal conclusion that the words "soliciting or petitioning in the plants" do not reasonable and logically include and have reference to during regular shifts or work time is unwarranted, and is not supported by logic or legalistic reason. The Examiner's finding of an unfair la-

bor practice on the part of Chang in charge and finding 1 is illegal and *must fail*. N.L.R.B. v. Essex Wire Corp., supra.

"The rule posted by the company forbidding solicitation for union membership on the company's premises during working hours was valid. The fact that the order the company posted *was of a broader scope* did not prevent the application of the rule to a valid situation to which it was clearly applicable." [Emphasis supplied.]. N.L.R.B. v. William Davies Co., 135 F.2d 179, 182–183.

In other words, this Article XXII is severable; the invalid portion does not vitiate the valid, and Chang may utilize the valid portion without regard to the invalid portion.

## DISCUSSION OF TESTIMONY

██ It is the undisputed fact that each of the four termination notices to the dischargees state as the reason for their discharge the violation of Article XXII of the Union agreement, but under all of the circumstances that fact does not bind Chang to the unlawful portion of the Article and deprive it of the lawful portion. It is the undisputed testimony of William T. Walker, a witness for the Board, that he is the personnel manager of Chang and that his duties, *inter alia*, are:

"A. The administration of overall policies, concerning the personnel of the company and safety. That is, the hiring of individuals and the policies, as such, governing the working conditions." (Tr. 64.)

And he identified a contract between Chang and Zirconium and Union and acknowledged that he had signed the four dischargees' separation notices, and he issued memorandums from Chang to Zirconium and Union concerning the four dischargees. Neither cross-exam-

---

1. "6. N.L.R.B. v. Edinburg Citrus Ass'n., 5 Cir., 147 F.2d 353; N.L.R.B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486; Olin Industries, Inc., [Winchester Repeat-

ing Arms Co. Division] v. N.L.R.B., 5 Cir., 191 F.2d 613, certiorari denied 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332." 245 F.2d 589, 593 (CA 9 1957).

ination nor redirect examination contained any probative evidentiary value, nor does Mr. Walker's testimony in any way tend to prove or contain any substantial evidence of any of the Board's four charges of unlawful conduct or unfair labor practices in violation of the Relations Act, particularly charges and findings 2 and 3. It is clear from the record that each of the four discharged employees well knew they were being discharged for solicitation and petitioning on behalf of Council in the plants during the shifts or working hours of other employees, and not because they had been required to do the prohibited act of getting the consent of Chang and Union to solicit or that they had sought and been refused such consent.

A resumé or narrative of the testimony of Quinton Dombrowsky, who appeared as a witness for Council, is as follows:

That he was employed by Chang as a lead operator in the tantalum and columbium reduction department in October of 1958. He acknowledges that during October of 1958 he engaged in union activities on behalf of Council in passing out designation cards. That on a Wednesday, October 23, while he was on swing shift, he received a phone call from Kenneth Radford, a foreman at the tantalum, columbium and zirconium separations plant, who required some asbestos, and made inquiry if Dombrowsky had any in the store. Dombrowsky told him that he did. Radford shortly came to Dombrowsky's plant and selected his desired asbestos. The two men engaged in conversation and Radford questioned Dombrowsky about Council, indicating that he, Radford, had heard there had been some soliciting going on. Dombrowsky disclaimed any knowledge about it except that he was looking for a card to sign and that he would sure like to find a card, whereupon Radford reiterated "I think you have been soliciting around." Radford made inquiry as to whether Dombrowsky knew where he (Radford) could get ahold of some of the cards. The balance of the conversation on that occasion consisted of suggestions of workmen who might have Council's cards and as to the relative benefits to the workmen of Union and Council. On the following night (October 24), Radford again telephoned Dombrowsky and their conversation concerned asbestos. Whereupon the testimony of Dombrowsky becomes critical and should be quoted from the record:

"A. * * * I said, 'Is there anything else you wanted like asbestos gloves or something.' They generally come to our plant for gloves or medicine. He said, 'No, but I will tell you what, I will be over in a little bit, because I found out about that international union.' I said, 'Oh, you did.' Then he hung up and he dropped over just before dinner time.

"Trial Examiner: What shift were you working on?

"The Witness: Swing shift. He came over and I was working on the floor there. I said, 'You didn't like that asbestos.' He said, 'No, that was no good.' He said, 'I have got some of those cards. I finally found some of those cards.' I said, 'Oh, where did you get them.' I said, 'I would like to sign one. I have been trying to find one.' I said, 'I don't believe you have any.' He said, 'Yes, I do. I have them.' I said, 'Let me see them. I don't believe you.' He reached in his shirt pocket and pulled this one out, and he showed me that he had a bargaining card.

"Trial Examiner: For what union?

"The Witness: For the Metal Trades Council of Portland, Oregon.

"Q. I will show you General Counsel's Exhibit 1 , was the card the same as this, not the identical card?

"A. It was the same fine print, but there was a name on the [40] card.

"Q. Where was the name?

"A. It was up here in the left-hand corner.

"Q. Did you know whose name was there?

"A. Yes, it had Ronald Graham's name on it.

"Trial Examiner: This was on the 24th?

"The Witness: Yes.

"Q. Did you talk any more about the cards or about the union after that?

"A. We talked just back and forth. I told him that I had received a call from one of our—the independent union had called earlier and wanted to talk to me. I told him that I wanted to call him back. So, I did. I called him back and instead of getting Mr. Barnhart, I got Mr........

"Q. Who is Mr. Barnhart, now?

"A. He is the operator or assistant crew foreman, I think at that time, over at Zirconium Reduction.

"Q. You attempted to call Mr. Barnhart then?

"A. Yes.

"Trial Examiner. How do you spell his name?

"The Witness: B-a-r-n-h-a-r-t.

"Q. You mentioned before that he was connected with the independent union?

"A. Yes.

"Q. What was his office? [41]

"A. I don't know at that time. I believe he was a trustee, or something of the Board.

"Q. Did you dial for his departmental number then?

"A. Yes.

"Q. Did you talk to Mr. Barnhart?

"A. No, I didn't get ahold of Mr. Barnhart. The floor above him answered and it was the crew foreman, Mr. John Keller.

"Q. Mr. John Keller is the crew foreman in what department?

"A. Zirconium reduction. He answered the phone and I asked for Mr. Barnhart. He said he was busy at that time. I said, 'Well, would you tell him I will see him after work.' He said that he would. He also said, 'I hear that you have been soliciting over at the separations building, you and another fellow.' I said, 'That must be just rumors going around because *I wouldn't do anything like that.*' [Italics supplied.] He said, 'You know if you continue to solicit for the international union, you will get into trouble.' He said, 'You could be fired.' He said, 'I thought I would warn you.' I said to him, 'Thanks anyway, but I don't believe these rumors. There are all kinds of them going around.' Then Mr. Radford asked for the phone at that time.

"Trial Examiner: Was Mr. Radford with you at this time?

"The Witness: Yes, all through this conversation.

\*      \*      \*      \*      \*

"Q. Did you ever hear from Mr. Radford again concerning this matter?

"A. Not particularly this same matter. He called the following night again, just on the phone.

"Q. On the telephone?

"A. Yes, sir. About the same time of the evening.

"Q. What time of the evening was it?

"A. 6:30 or 7:00 something like that, or 7:30. He said, 'I hear the other night while I was over talking with you that you had a man out soliciting for this international union.' I said, '*No, I don't know anything about that.*' [Italics supplied.] He said, 'Well, he was over at Zirconium reduction while I was over talking to you.' I said, 'Oh', I said, 'that is the way the ball bounces.' Made some joke. He

said, 'Well, you are going to get into trouble if you keep this up.' I said, *'I don't know what you are talking about.'* [Italics supplied.] And he hung up." (Tr. 90–94).

Dombrowsky received his discharge slip on November 1, 1958.

On cross-examination, Dombrowsky acknowledged that he had talked to Radford on October 23, and that he had denied any knowledge of solicitation at the Chang plants and further acknowledged that he was aware that solicitation for Council was going on at the Chang plants and that he had, in effect, lied to Radford when he had disclaimed knowledge of solicitation. At this point the cross-examination of Dombrowsky becomes critical and the record is quoted:

"Q. How long before the 23rd had you actually known that soliciting was going on?

"A. I believe it was the day before, or the very same day.

"Q. You were one of the solicitors, weren't you?

"A. Yes.

"Q. You solicited during working hours, didn't you?

"A. No.

"Q. Didn't you solicit—by 'solicit' I mean talk to or [45] discuss with other workmen in your department or on the same shift that were working with you, the desirability of signing a card for the Metal Trades Council?

"A. I would say I mentioned it perhaps during their coffee break, yes.

"Q. But you didn't mention it at any time other than during a coffee break?

"A. Not that I recall.

"Q. You don't recall talking to Louis Winterstein about distributing union cards?

"A. Yes, I remember that.

"Q. Was that during the regular shift, company time?

"A. I was off duty.

"Q. *But Mr. Winterstein was on duty, wasn't he?*

"A. *Yes.* [Italics supplied.]

"Q. And you talked with him while he was supposed to be working, didn't you?

"A. I asked two other men if he was busy.

"Q. Just answer my question. He was supposed to be working at that time, wasn't he?

"A. Those were his working hours.

"Q. *And you talked to him during his working hours?*

"A. *Yes.* [Italics supplied.]

\* \* \* \* \* \*

"Q. On October 23rd, at the end of swing shift, you stayed on company property and into the graveyard shift, is that right?

"A. Yes, I was off after twelve.

"Q. Then you talked with Winterstein *while he was on shift?*

"A. *Yes.* [Italics supplied.]

"Q. You asked Winterstein to distribute these Metal Trades Council cards, did you not?

"A. I asked him if he was interested in the Metal Trades Council and showed him a bargaining card, and he said, yes, he was all for it and he signed a card. I also asked him if——

"Trial Examiner: At that time he signed a card?

"The Witness: Yes.

"Trial Examiner: When you had the conversation with him?

"The Witness: Yes, sir. I asked him if he knew of any other men that were interested in this international union or [47] the Portland Metal Trades. He said that he didn't know, but he would ask around, and at that time I gave him some more cards.

"Q. *This was while he was on shift?*

"A. *Yes, during his working hours.* [Italics supplied.]

"Q. At the time he signed that card, you gave him other cards?

"A. Yes. (Tr. 96–98.)

\* \* \* \* \* \*

"Q. Then Louis Winterstein is the only man you asked to sign the card while he was on shift?

"A. No, I would say this Earl Brooks.

"Q. You also asked Earl Brooks?

"A. Yes, the same evening that I talked with Louie Winterstein.

"Q. Was Brooks on swing shift with you or on graveyard shift?

"A. It would be graveyard because I was on swing and I was off." (Tr. 103–104)

Louis Winterstein corroborated Dombrowsky's admission of soliciting Council's card during working hours and while on duty. (Tr. 131). And further testified that he had talked with Ronald Graham, one of the dischargees, about signing Council's cards at the same time Dombrowsky was present. That Graham had participated in the solicitation during Winterstein's shift and during working hours. Further, that he had later had a telephone call from Graham while on shift and during working hours, asking Winterstein if he had any of the Council's cards signed. Winterstein also testified that one Larry Helms, an operator for the columbium side of the separations plant, was present during these conversations and was solicited by

Dombrowsky and that they engaged him in conversation too, while he was on duty and during working hours. (Tr. 133–134.) [2]

Cross-examination by Board's counsel develops that the witness had received other phone calls while on duty, but only on business or emergencies. That on this evening in question and during the conversation with Dombrowsky and Graham he and Helms each signed a Council authorization card while on duty and during working hours (Tr. 136–138), all of which is undisputed by Dombrowsky or Graham.

Dombrowsky's foregoing admissions under cross-examination to the direct effect that he had falsified his denials of any solicitation by himself on behalf of Council tends to discredit his direct testimony and robs it of any forcefulness. However, granting the testimony full credibility as a matter of law, the statements reportedly made to the dischargees did not amount to threats of discharge of any of them from employment because of union activities and were not clearly coercive in character to the hearers.

It is to be remembered that neither of the mentioned foremen were foremen of any of the four dischargees or held any power or authority to discharge. Further, that none of their warnings could rationally or reasonably be construed as threats of discharge, and can only be regarded as *de minimis*. Per curiam decision, N.L.R.B. v. Grunwald-

2. "Q. Was he (Helms) on duty?
"A. Yes.
"Trial Examiner: Why was he out there with you?
"The Witness: He has identical tanks only on the other side of the building.
"Trial Examiner: The other side of the building?
"The Witness: They are about ten feet apart.
"Trial Examiner: Did you say the other side of the building?
"The Witness: Well, it was the other side of the plant.

"Trial Examiner: How did he happen to be out with you then; were you over there with him?
"The Witness: No.
"Trial Examiner: You were watching your gauge?
"The Witness: Yes, and he was watching his.
"Trial Examiner: Ten feet away he was in the conversation?
"The Witness: No, he was standing with us.
"Trial Examiner: Then he was ten feet away from where he should have been?'
"The Witness: Yes." (Tr. 135–136)

Marx, Inc., 290 F.2d 210 (9 Cir.), decided April 3, 1961.[3]

No place in the record does there appear any substantial evidence of any unlawful discharge of the three remaining dischargees, Stutheit, Wallace, or Graham. In fact, none of these three dischargees appeared before the Examiner, nor was any reason or excuse offered for their nonappearance. It could be assumed that their testimony, if given, would be adverse to the Board.

"We * * * cannot conscientiously find that" the charges and Examiner's finding 2 of unlawful or discriminatory discharge of the four dischargees and charges and finding 4 of threatening with discharge, are supported by any substantial evidence "when viewed in the light that the record in its entirety furnishes," and therefore the findings must fall. N.L.R.B. v. Walton Mfg. Co., (N.L.R.B. v. Florida Citrus Canners Coop), 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 829 (per curiam opinion April 9, 1962).

The testimony of Russell D. Underwood, a witness for the Board, is of no probative value to any of the Board's charges and findings except to corroborate that witness Winterstein, for Chang, gave the witness a Council card upon which was the name "Graham" at the top of the card, which he in turn had delivered to Mr. Pryor, general foreman. This testimony is not substantive evidence of any of the Board's charges and findings, especially, 3, of alleged unlawful conduct and unfair labor practices by interfering with any agency's organizational rights by interrogation and threats of discharge, and is not supported by any substantial evidence and must fall.

The testimony of Paul J. Kotyo, a witness called by Chang, generally corroborated the testimony of Winterstein and recites that Allen W. Wallace had solicited him on behalf of Council while on shift and during working hours and that while on shift he had signed a Council card produced by Wallace (Tr. 141). Further narrations of Chang's witnesses are of no aid to us and would be of no comfort to the Board.

We conclude that there is no substantial evidence or reasonable or warrantable inferences from the entire evidentiary record of the case to substantiate any of the four charges and findings of the Examiner, and they all must therefore fall.

---

3. The Board in its brief asserts that Chang's employees conversed freely during working times about matters not relating to the work at hand (p. 10). This statement is not supported by any testimony, and are merely the leading questions and observations of the Examiner.
(Testimony of Paul J. Kotyo, Tr. 142–143).
"Q. Were there general discussions had from time to time between these three men, Dombrowsky, Graham and Wallace, with other employees in the slag plant about the union cards?
\* \* \* \* \*
"Q. I mean on your shift?
"A. On my shift, yes. There was three of us on that shift.
"Q. Did that tend to disrupt the operation?
"Mr. McCreary: Objected to, Mr. Examiner.
"Trial Examiner: Did what tend to disrupt?
"Q. Did these discussions tend to disrupt the operation of the slag plant?

"Mr. McCreary: I don't think the witness is qualified to give an opinion as to whether there was a disruption.
"Trial Examiner: Did you ever talk about anything on your shift as long as you worked for this company with other employees while you were working?
"The Witness: In regards to what? [96]
"Trial Examiner: Anything under the sun.
"The Witness: We talked about processing and things of that sort.
"Trial Examiner: Did you ever talk about baseball or football?
"The Witness: Hunting.
"Trial Examiner: Chew the rag all of the time?
"The Witness: We do. Most any shift does that.
\* \* \* \* \*
"Q. Over what period of time were these discussions; more than one week?
"A. Approximately a week or so."

24

## CONCLUSION

Accordingly, the petition of Chang to set aside the Board's decision and order, dated at Washington, D. C. on October 14, 1959, as appears from Tr. 46 through 53, with its appendix, here reviewed, is granted, and the order is set aside and held for naught.

HAMLEY, Circuit Judge (dissenting).

In the fall of 1958, Wah Chang Corporation and Zirconium and Allied Metals Union (Independent) were operating under a collective bargaining agreement, Article XXII of which provided:

"There shall be no soliciting or petitioning in the plants without the consent of the Company and the Union."

During October 1958, the Metal Trades Council of Portland and Vicinity, AFL–CIO (Union) conducted an organizing campaign at petitioner's plant. Among the company employees who participated in this campaign were William L. Stutheit, Ronald E. Graham, Allen W. Wallace and Quinton D. Dombrowsky. On November 3 and 4, 1958, these employees were discharged, each being handed a "Personal Action Blank" which stated that he was discharged for "violation of Article XXII of the Existing Union Agreement."

The Union filed unfair labor practice charges against the company and a hearing was had before an Examiner of the National Labor Relations Board. The Examiner found and concluded that:

1. The company discriminatorily discharged the four employees, this constituting an unfair labor practice within the meaning of section 8(a) (3) of the National Labor Relations Act, 29 U.S.C., § 158(a) (3);

2. The company interrogated its employees regarding their Union membership and activities and threatened them with discharge if they engaged in protected activities on behalf of the Union, this constituting an unfair labor practice within the meaning of section 8(a) of

the Act, 29 U.S.C., § 158(a) (1); and

3. The company maintained and gave effect to a provision in the collective bargaining agreement with Independent which requires permission from such union for the company's employees to engage in solicitation on petitioner's premises, this being an unfair labor practice within the meaning of section 8(a) (2) of the Act, 29 U.S.C., § 158(a) (2).

The Examiner recommended that the company be ordered to cease and desist from engaging in these practices, that the discharged employees be reinstated with lost pay, and that the usual notice to employees of intention to comply in the future be posted. The Board adopted the Examiner's findings, conclusions and recommendations except that, as additional affirmative relief, the company was ordered to withdraw recognition from Independent until it demonstrates its majority status.

In its petition filed in this court, the company does not challenge the third finding and conclusion set out above. As to the other two, the company's only contention is that they are not supported by substantial evidence.

Turning to the first of these it is the contention of petitioner that under the undisputed evidence the four employees were discharged because they engaged in union solicitation during working time. Hence, it is argued, there is no substantial evidence that they were discharged merely because they solicited on the premises, or because they solicited for Union distinguished from Independent, or because they had not first obtained the permission of Independent.

There was substantial evidence tending to indicate that these four employees solicited on the company premises at a time when they, or the individuals being solicited, or both, were supposed to be working. Testimony to this effect was given by Louis Winterstein, Paul Kotyo, Earl D. Matthews, John Keller and Verle S. Barnhart. In addition, Dombrowsky,

one of the discharged employees, admitted on cross-examination that he talked to two employees, Louis Winterstein and Earl Brooks, about distributing Union cards while the latter were on duty. Dombrowsky also admitted, on cross-examination, that while he was on duty he conversed with another employee, Robert Tidwell, about Union.

On the other hand, there was evidence to the effect that, whether or not there was solicitation on company time, the four employees were not discharged for that reason, but for other reasons which rendered the discharges discriminatory and constituted an unfair labor practice under section 8(a) (3). These other reasons, according to the evidence, were: (1) soliciting on the company premises without the company's permission, without regard to whether solicitation was carried on during company time; (2) soliciting on the premises in favor of Union as distinguished from Independent; and (3) soliciting on the premises without the permission of Independent.

Concerning the first of these proscribed reasons, the principal supporting evidence consists of the recital contained in the "Personnel Action Blank" which was handed to each discharged employee, attributing the discharge to a violation of Article XXII of the agreement with Independent. That article, quoted above, among other things forbids "soliciting or petitioning in the plants without the consent of the Company. * * *"

The quoted words do not limit the rule against solicitation and petitioning in the plants without company consent to solicitation and petitioning carried on during working time. To the extent that it forbade such activity without company consent during non-working time, including rest periods, it constituted an interference with union organization prohibited by section 8(a) (1) of the Act. Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 803, 65 S.Ct. 982, 89 L.Ed. 1372; N. L. R. B. v. Essex Wire Corp., 9 Cir., 245 F.2d 589, 593.

Since the article itself is not limited to employee solicitation during working time, and since the employees were advised that they were discharged for violating the article the Examiner could reasonably infer that the grievance was not that working time was being used, but that solicitation was engaged in on the premises. Substantial support for such an inference is to be found in Dombrowsky's testimony that he was never cautioned for soliciting on working time, but only for soliciting on the premises. His further testimony, referred to below, provides additional support for the indicated inference.

As to the second proscribed reason for the discharges, referred to above (soliciting for Union as distinguished from Independent), Dombrowsky testified that two supervisory employees, Kenneth Radford and John Keller, criticized him for soliciting for Union. According to this witness, Radford told Dombrowsky that if the employees were represented by the international they would not receive free coffee and gloves, two weeks paid vacation "and a lot of other benefits that you receive now." Radford further said, according to Dombrowsky, " * * * with an international union you pay higher dues and have all kinds of strikes and things like that." Dombrowsky testified that Keller warned Dombrowsky that "if you continue to solicit for the international union you will get into trouble. * * * You could be fired. * * * I thought I would warn you."

Petitioner called Keller as a witness but did not ask him if he voiced the warning as testified to by Dombrowsky. The latter's testimony on this point therefore stands unchallenged. Radford was also called as a witness by petitioner. He was not asked specifically concerning the conversation related by Dombrowsky in which the relative merits of the two unions were discussed. Radford gave some testimony, however, which varied to some extent from that of Dombrowsky.

The Examiner, however, chose to credit Dombrowsky's testimony and discredit Radford's. Noting that the testimony of this witness was at variance to

some extent with that of Radford, the Examiner stated in his decision:

"* * * In the light of the entire record in the case, coupled with the fact that Dombrowsky particularly impressed the undersigned as being one who was meticulous in not enlarging his testimony beyond his actual memory of what occurred whereas Radford, on the other hand, gave the undersigned the impression that he was attempting to conform his testimony to what he considered to be the best interest of Respondent [petitioner], the undersigned finds Dombrowsky's version of the above referred to conversations with Radford to be substantially in accord with the facts."

Dombrowsky's testimony is not inherently incredible, and the contrary testimony is not of such nature that it cannot in law be discredited. The determination of the Examiner and the Board concerning Dombrowsky's credibility is therefore binding upon this court. N. L. R. B. v. Pittsburgh S.S. Co., 337 U.S. 656, 659–660, 69 S.Ct. 1283, 93 L.Ed. 1602.

Concerning the third proscribed reason for the discharges referred to above (failure to obtain Independent's permission to solicit), crew foreman Russell D. Underwood testified that the whole inquiry concerning solicitation for the international union got under way when William Feigenbaum, secretary of the local union, informed Underwood that "he thought perhaps there were cards being distributed." The local union had no legitimate interest in whether solicitation was being carried on during working time. It was very apparently interested only in enforcing Article XXII which required local union consent before there could be such solicitation—or so the Examiner was free to find.

It may also be noted that with respect to Dombrowsky the local union took no action to contest the discharge, as it could have done under section 2 of Article XI and step 3 of Article XVIII of the agreement. With respect to the other three employees who were discharged the union filed protests which in each case were not timely and were for that reason rejected. A permissible inference from this lack of union backing is that the discharged employees had transgressed the agreement which forbade solicitation without the consent of the local union.

Since there was substantial evidence to support the Examiner's determination, adopted by the Board, that the discharges were motivated by one or more of the proscribed reasons, the finding and conclusion that such discharges violate section 8(a) (3) of the Act should be sustained. The discharges being for proscribed reasons it is immaterial that there may have been other and valid reasons not relied upon by the company in effectuating the discharges.

The only other finding and conclusion which is challenged, relates to interrogation of and threats against employees concerning union activity. As stated above, Dombrowsky testified concerning such interrogations and threats by Radford and Keller and the Examiner and Board were entitled to accept his testimony.

Petitioner argues that Radford and Keller were only giving their friend Dombrowsky some information and that in any event, neither of them had direct supervision over Dombrowsky or the authority to discharge him.

The personal relationship which then existed between Dombrowsky and the two supervisory employees is a relevant consideration in determining whether their conversations had the tendency of interfering with or coercing Dombrowsky in the exercise of his protected right to assist Union in organizing petitioner's employees. But the Examiner was in a better position than are we to appraise this factor along with all of the other circumstances of the case.

Radford and Keller had supervisory status. While Dombrowsky was not subject to their direction and control the Examiner was warranted in finding that

he and other employees regarded them as representatives of management. See N. L. R. B. v. West Coast Casket Co., 9 Cir., 205 F.2d 902.

I would affirm the Board order.